GEER, Judge.
 

 *357
 
 Defendant Dan L. Merrell appeals from an order of discipline of the Disciplinary Hearing Commission of the North Carolina State Bar (the "DHC") concluding that defendant violated the Rules of Professional Conduct by: (1) failing to safeguard and hold in trust clients' entrusted funds in violation of Rule 1.15-2(a) and (2) engaging in a conflict of interest by representing both parties to a commercial real estate transaction without first obtaining written and informed consent in violation of Rule 1.7(a). We hold that the DHC's findings of fact are supported by substantial
 
 *106
 
 evidence in the record, and the findings, in turn, support the DHC's conclusions of law. Consequently, we affirm.
 

 Facts
 

 The North Carolina State Bar commenced this disciplinary action against defendant by filing a complaint on 12 April 2012. This case arises out of defendant's representation of Michael Lam, a real estate developer. In its order of discipline, the DHC found, in pertinent part, the following facts.
 

 In late 2005, Lam sought to develop a residential community, initially to be called Blue Water Cove, in Tyrrell County, North Carolina. Lam had entered into contracts to purchase the land that he wished to develop, but did not have the funds to finance the project. Lam solicited Thomas and James Gordon, who were residents of the State of Maryland, to participate in an investment project to buy and develop the land for Blue Water Cove. With the assistance of John Bollech, Lam created a term sheet for Blue Water Cove that included a description of the project with cost and profit projections. The term sheet stated that the cost of acquiring the land for the project was $1.5 million. Lam advised the Gordons that he needed to move quickly because his contracts to purchase the land had either expired or were about to expire.
 

 *358
 
 On 20 December 2005, Lam and Bollech met with defendant at his office to discuss the Blue Water Cove project. Lam informed defendant that he wanted to form an LLC for the project and that the Gordons had committed to fund $2,450,000.00 toward the project with $1,500,000.00 designated for the purchase of the land. The Gordons were represented by Steven Nemeroff, an attorney licensed to practice in Maryland. Between late December 2005 and 12 January 2006, defendant communicated with Nemeroff and lawyers representing Bollech in the drafting of a memorandum of understanding ("MOU") among the individuals and entities who would have an ownership interest in the project.
 

 On 29 December 2005, defendant filed articles of organization to form Deepwater Development Company, LLC ("Deepwater")-Lam was the sole member of Deepwater. On 13 January 2006, Lam, the Gordons, Bollech, Bernard Brooks, and Bill Reidy executed an MOU related to the development of Blue Water Cove. The MOU contemplated that a company would be formed to carry on the business of the project and that the Gordons would loan $1.5 million to that company to acquire the land. The MOU contained a provision prohibiting self-dealing by Lam or any other party to the MOU.
 

 On 18 January 2006, defendant drafted the articles of organization for Development Company of Columbia, LLC ("DCC"), the company created for purchasing and developing the land for Blue Water Cove. The articles named Lam as the organizer and registered agent and used Lam's home address as DCC's registered office. Also on 18 January 2006, the Gordons wired $1.5 million to defendant's general trust account maintained at the Bank of Currituck. The Gordons expected Merrell to hold their funds in trust to be disbursed to pay for DCC's purchase of the land at closing. Although the funds belonged to the Gordons, they were recorded in defendant's trust account ledger under the name of Lam.
 

 The following day, defendant wrote a note to an associate in his law office, Bill Stott, advising Stott that Lam intended to purchase a parcel of the Tyrrell County land for $360,000.00 and then sell it to DCC for $650,000.00, and that Lam also wanted to buy two parcels from other owners of the Tyrrell County land using investor money and convey only one parcel to DCC, with Lam and Bollech keeping the second parcel, consisting of more than 80 acres, free and clear. Defendant advised Stott that he saw potential for criminal and civil liability in both transactions and directed Stott to draft a letter to Lam and a disclosure letter.
 

 *359
 
 On 23 January 2006, defendant filed the articles of organization for DCC with the Secretary of State. On or about that day, defendant sent a letter to Lam advising him that the series of transactions that he contemplated could constitute fraud and violate state and federal law. Defendant advised Lam that he would not represent him in the transactions unless full and complete disclosure was made to Lam's investors and potential
 
 *107
 
 partners and all of them acquiesced in the proposed arrangement. Defendant stated that his office would prepare disclosure documents to be executed after he verified that full disclosure had been made to all parties.
 

 Despite the language of the 23 January 2006 letter, defendant did not draft a disclosure letter. Lam told defendant that he had made full disclosure to all interested parties, including the Gordons, of the fact that he planned to acquire the land for less than $1.5 million. Defendant believed Lam and did not insist on any written documentation that full disclosure had in fact been made.
 

 On 24 January 2006, defendant transferred the Gordon's $1.5 million to a certificate of deposit account ("CD account") at Bank of America in the name of "Dan L. Merrell, Special Trustee for Development Company of Columbia, LLC." The address given for the account was Lam's address, and the tax identification number used was that of DCC. Defendant did not ensure that there was a signature card that would limit signatory authority on the account to him.
 

 Although not signed by the members until 1 March 2006, the operating agreement of DCC, by its terms, became effective 1 February 2006. The operating agreement provided that Lam was the manager of DCC and, through Deepwater, was also a member of DCC. The term "property" under the agreement was defined as four separate parcels or interests referred to as the Sykes tract, the Davis tract, Ludford Landing, and an easement in an existing canal on the Taylor tract. Lam, as a manager of DCC, was prohibited by the agreement from self-dealing.
 

 In February 2006, defendant was the closing attorney for Lam in Lam's purchase, through Deepwater, of the following tracts of land: on 3 February 2006, the Sykes tract for $360,000.00; on 9 February 2006, the Taylor tract for $267,500.00; on 14 February 2006, the Pinner interest in Ludford Landing for $16,666.00; on 15 February 2006, the Cahoon interest in Ludford Landing for $50,000.00, and the Davis tract for $300,000.00. In all, Deepwater paid a total of $726,666.00 to acquire the properties. Although defendant was aware that Deepwater acquired the entire Taylor tract for only $267,500.00, on 16 February 2006, defendant
 
 *360
 
 contacted Nemeroff on behalf of Lam to confirm that the Gordons would provide an additional $295,000.00 for DCC to purchase a license and easement for use of the existing canal on the Taylor tract.
 

 Meanwhile, funds were withdrawn from the Bank of America CD account without the Gordons' knowledge, permission, or approval on 27 January 2006, 14 February 2006, and 1 March 2006. These withdrawals were used for Lam's benefit, including funding Deepwater's purchase of the Tyrrell County land. Defendant was not, however, aware that the funds were wrongfully withdrawn from the CD account without his authorization until sometime in September 2006.
 

 On 2 March 2006, defendant was the closing attorney for the transaction in which DCC bought the Tyrrell County land and the Taylor tract easement from Deepwater for $1,745,000.00. Defendant represented DCC, Lam, and Deepwater at the closing. The transaction resulted in a profit of close to $1 million to Deepwater at the expense of DCC.
 

 The 1 March 2006 withdrawal from the CD account closed out the account. However, defendant did not provide the Gordons with a written accounting of the receipts and disbursements of the $1.5 million upon the complete disbursement of the funds and did not account for the interest earned on the funds while in the CD account.
 

 Based upon these findings, the DHC concluded that defendant's conduct constituted grounds for discipline pursuant to N.C. Gen.Stat. § 84-28(b)(2) (2013) in that defendant violated the Rules of Professional Conduct:
 

 a. By moving the Gordons' funds from defendant's trust account to a certificate of deposit account at Bank of America in the name of "Dan L. Merrell, Special Trustee for Development Company of Columbia, LLC" with Lam's mailing address on the account, using DCC's tax identification number, failing to ensure access to the account was limited to himself, and failing to provide an accounting, along with other factors noted above, Merrell failed
 
 *108
 
 to safeguard and hold in trust the Gordons' entrusted funds in violation of Rule 1.15-2(a).
 

 b. By representing both Deepwater and DCC at the closing on March 2, 2006 when Defendant's representation of DCC was materially limited by his responsibilities to Deepwater and he had not obtained the written
 
 *361
 
 informed consent of the clients to the dual representation, Defendant engaged in a conflict of interest in violation of Rule 1.7(a).
 

 The DHC suspended defendant's law license for two years and stayed the suspension for a period of two years contingent on defendant's compliance with certain conditions. Defendant timely appealed the order to this Court.
 

 I
 

 On appeal, defendant argues that the DHC violated his due process rights because the allegations in the complaint did not provide him with adequate notice of the conduct upon which the DHC ultimately relied in concluding that defendant violated Rules 1.15-2(a) and 1.7(a) of the Rules of Professional Conduct. This Court has explained that
 

 "[n]otice and an opportunity to be heard prior to depriving a person of his property are essential elements of due process of law which is guaranteed by the Fourteenth Amendment of the United States Constitution. Accordingly, prior to the imposition of sanctions, a party has a due process right to notice both (1) of the fact that sanctions may be imposed, and (2) the alleged grounds for the imposition of sanctions."
 

 N.C. State Bar v. Barrett,
 

 219 N.C.App. 481
 
 , 485-86,
 
 724 S.E.2d 126
 
 , 129 (2012) (quoting
 
 In re Small,
 

 201 N.C.App. 390
 
 , 395,
 
 689 S.E.2d 482
 
 , 485-86 (2009) ). Thus, "[a]n attorney facing disbarment is entitled to 'procedural due process, which includes fair notice of the charge' made against [him]."
 

 Id.
 

 at 486
 
 ,
 
 724 S.E.2d at 129-30
 
 (quoting
 
 In re Ruffalo,
 

 390 U.S. 544
 
 , 550,
 
 88 S.Ct. 1222
 
 , 1226,
 
 20 L.Ed.2d 117
 
 , 122 (1968) ).
 

 Correspondingly, the State Bar rules provide that "[c]omplaints in disciplinary actions will allege the charges with sufficient precision to clearly apprise the defendant of the conduct which is the subject of the complaint[,]" 27 N.C. Admin. Code 1B.0114(c) (2014), and that "[p]leadings and proceedings before a hearing panel will conform as nearly as practicable with requirements of the North Carolina Rules of Civil Procedure and for trials of nonjury civil causes in the superior courts except as otherwise provided herein [,]" 27 N.C. Admin.Code 1B.0114(n).
 

 Rule 8(a)(1) of the Rules of Civil Procedure, in turn, requires "[a] short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series
 
 *362
 
 of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief[.]" This Court has explained that "[b]y enacting section 1A-1, Rule 8(a), our General Assembly adopted the concept of notice pleading."
 
 Wake Cnty. v. Hotels.com, L.P.,
 
 ---N.C.App. ----, ----,
 
 762 S.E.2d 477
 
 , 486,
 
 disc. review denied,
 

 367 N.C. 799
 
 ,
 
 766 S.E.2d 608
 
 (2014). "Under notice pleading, 'a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of
 
 res judicata,
 
 and to show the type of case brought.' "
 

 Id.
 

 (quoting
 
 Sutton v. Duke,
 

 277 N.C. 94
 
 , 102,
 
 176 S.E.2d 161
 
 , 165 (1970) ). " 'Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.' "
 

 Id.
 

 (quoting
 
 Pyco Supply Co. v. Am. Centennial Ins. Co.,
 

 321 N.C. 435
 
 , 442-43,
 
 364 S.E.2d 380
 
 , 384 (1988) ). Thus, "detailed fact-pleading is no longer required" so long as the pleading "gives sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand the nature of it and the basis for it, to file a responsive pleading, and-by using the rules provided for obtaining pretrial discovery-to get any additional information he may need
 
 *109
 
 to prepare for trial."
 
 Sutton,
 

 277 N.C. at 104
 
 ,
 
 176 S.E.2d at 167
 
 .
 

 Here, defendant argues that the DHC based its conclusion that defendant violated Rule 1.15-2(a) and Rule 1.7(a) on conduct by defendant that was outside of the allegations of the complaint. With respect to Rule 1.15-2(a), the DHC concluded that defendant:
 

 By moving the Gordons' funds from defendant's trust account to a certificate of deposit account at Bank of America in the name of "Dan L. Merrell, Special Trustee for Development Company of Columbia, LLC" with Lam's mailing address on the account, using DCC's tax identification number, failing to ensure access to the account was limited to himself, and failing to provide an accounting, along with other factors noted above, Merrell failed to safeguard and hold in trust the Gordons' entrusted funds in violation of Rule 1.15-2(a).
 

 Defendant argues that the complaint alleged only that defendant violated Rule 1.15-2(a) "[b]y moving the Gordons' funds from his trust account to a CD account in the name of DCC and with Lam's mailing address [.]" Therefore, defendant asserts, the complaint alleged a different name for the CD account and failed to allege (1) that defendant
 
 *363
 
 used DCC's tax identification number, (2) that defendant failed to ensure access to the account was limited to himself, and (3) that defendant failed to provide an accounting.
 

 We first note that in characterizing the allegations of the complaint, defendant relies exclusively on the allegations contained in the final conclusory paragraphs of the complaint, setting forth which Rules of Professional Conduct defendant violated, and completely ignores the factual allegations alleged in support of that conclusion. The factual allegations of the complaint state more specifically, in pertinent part, that on 24 January 2006, Merrell transferred the Gordons' funds, without their knowledge or permission, to a CD account at Bank of America "in the name of 'Dan L. Merrell, Special Trustee for Development Company of Columbia, LLC', not in the name of the Gordons or as trustee for the Gordons." The complaint further alleged that "[f]unds were withdrawn from this CD account without the Gordons' knowledge, permission, or approval on January 27, 2006, February 14, 2006, and March 1, 2006" and that these withdrawals were for Lam's benefit, including covering Lam's costs to acquire the Tyrrell County property which was later resold to DCC.
 

 These allegations not only gave defendant notice of the name of the CD account as found in the DHC's order, but also of the underlying conduct that is the subject of the complaint: that defendant's transfer of the Gordons' funds, without their permission, resulted in the funds being accessed by and for the benefit of someone other than the owner of the funds. Although the complaint does not specifically allege that defendant used DCC's tax identification number or that he failed to provide the Gordons with an accounting, these facts are incidental to the primary misconduct alleged: defendant's failure to safeguard and hold in trust the Gordons' funds. We hold that the allegations in the complaint were sufficient under the notice pleading standard to give defendant "sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand the nature of it and the basis for it ... and-by using the rules provided for obtaining pretrial discovery-to get any additional information he may need to prepare for trial."
 
 Sutton,
 

 277 N.C. at 104
 
 ,
 
 176 S.E.2d at 167
 
 .
 

 With respect to the Rule 1.7(a) violation, defendant argues that the allegations of the complaint materially differ from the findings of fact and conclusions of law in the order because the complaint alleged that defendant engaged in a conflict of interest "[b]y representing both DCC and Lam in DCC's purchase of the Tyrrell County property," whereas the order concludes that the violation is based upon defendant's
 
 *364
 
 representation of both DCC and Deepwater at the closing. Defendant argues that there is a material difference between Deepwater and Lam because Deepwater is an LLC and Lam is an individual. While this is true, we do not agree that the difference between Lam and Deepwater deprived defendant of notice of the basis for the alleged conflict of interest. The complaint makes it clear that the DHC
 
 *110
 
 considered Lam and Deepwater, for all intents and purposes, as one and the same. The complaint alleged that Deepwater was Lam's company and that defendant was the closing attorney "for a series of transactions in which Lam, through his company Deepwater" purchased the Tyrrell County land. It also alleged that DCC's purchase of the property resulted in a profit of nearly $1 million going to "Lam/Deepwater." We therefore hold that the allegations of the complaint are not materially different from the findings of fact and conclusions of law in the order.
 

 Furthermore, the State Bar argues, and we agree, that even assuming that the allegations of the complaint were materially different from the findings in the order, the State Bar's pleading was amended by implied consent to conform to the proof presented at trial. The doctrine of implied consent is based upon Rule 15(b) of the Rules of Civil Procedure, which provides:
 

 When issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, either before or after judgment, but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues raised by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be served thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.
 

 As explained by our Supreme Court, "[u]nder 15(b) the rule of 'litigation by consent' is applied when no objection is made on the specific ground that the evidence offered is not within the issues raised by the
 
 *365
 
 pleadings."
 
 Roberts v. William N. & Kate B. Reynolds Mem'l Park,
 

 281 N.C. 48
 
 , 58,
 
 187 S.E.2d 721
 
 , 726 (1972) (emphasis omitted). "[T]he effect of this rule is to allow amendment by implied consent to change the legal theory of the cause of action so long as the opposing party has not been prejudiced in presenting his case, i.e., where he had a fair opportunity to defend his case."
 
 Id.
 
 at 59,
 
 187 S.E.2d at 727
 
 .
 

 Here, defendant did not object at the hearing to the admission of the evidence presented in support of the findings that he now challenges on appeal. Specifically, he did not object to the admission of evidence regarding the name of the CD account, the use of DCC's tax identification number for the CD account, defendant's failure to provide an accounting, or his representation of Deepwater, rather than Lam, at the 2 March 2006 closing. Further, defendant makes no argument as to how the introduction of this evidence prejudiced him or deprived him of a fair opportunity to defend his case. Accordingly, we hold that the order did not violate defendant's due process rights.
 
 Compare
 

 Barrett,
 

 219 N.C.App. at 488
 
 ,
 
 724 S.E.2d at 131
 
 (holding DHC violated attorney's due process rights where complaint contained one allegation of misconduct related to misrepresentations by closing attorney in a HUD statement, but at the hearing the lender presented a second HUD statement and made additional allegations of misconduct based on that document and attorney objected to evidence on grounds that she had never seen the document before, had no notice of its existence, and had not prepared a defense to the additional allegations of misconduct).
 

 II
 

 We now turn to the substance of the order. This Court reviews disciplinary orders of the DHC under the whole record test "to determine if the DHC's findings of fact are supported by substantial evidence in view of the whole record, and whether such findings of fact support its conclusions of law [.]"
 
 N.C. State Bar v. Talford,
 

 356 N.C. 626
 
 , 632,
 
 576 S.E.2d 305
 
 , 309 (2003).
 

 Such supporting evidence is substantial if a reasonable person might accept it as adequate
 
 *111
 
 backing for a conclusion. The whole-record test also mandates that the reviewing court must take into account any contradictory evidence or evidence from which conflicting inferences may be drawn. Moreover, in order to satisfy the evidentiary requirements of the whole-record test in an attorney disciplinary action, the evidence used by the DHC to
 
 *366
 
 support its findings and conclusions must rise to the standard of clear[, cogent,] and convincing.
 

 Id.,
 

 576 S.E.2d at 309-10
 
 (internal citations and quotation marks omitted).
 

 Defendant first challenges the DHC's conclusion that defendant violated Rule 1.15-2(a) of the Rules of Professional Conduct. Pursuant to Rule 1.15-2(a), "[a]ll entrusted property shall be identified, held, and maintained separate from the property of the lawyer, and shall be deposited, disbursed, and distributed only in accordance with this Rule 1.15." "Entrusted property" includes "trust funds" which are "funds belonging to someone other than the lawyer that are received by or placed under the control of the lawyer in connection with the performance of legal services." N.C.R. Prof. Conduct 1.15-1(e), (n). Rule 1.15 provides, in pertinent part, that all trust funds received by a lawyer must be deposited in either a general trust account, also known as an IOLTA account, or a dedicated trust account. N.C.R. Prof. Conduct 1.15-2(b). IOLTA accounts are subject to the requirements set forth in 27 N.C. Admin. Code 1D.1316.
 

 Id.
 

 A lawyer should place trust funds in an IOLTA account if the funds "in the lawyer's good faith judgment, are nominal or short-term."
 

 Id.
 

 Otherwise, the funds may be placed in a dedicated trust account, which is "a trust account that is maintained for the sole benefit of a single client or with respect to a single transaction or series of integrated transactions." N.C.R. Prof. Conduct 1.15-1(c). The interest earned in a dedicated trust account is the property of the client. N.C.R. Prof. Conduct 1.15-2(p). Comment 3 following Rule 1.15-3 contains a list of factors to be considered when determining whether there is a duty to invest the funds on behalf of a client by depositing the funds into a dedicated trust account.
 

 Rule 1.15-3 sets forth the record keeping and accounting requirements for all trust accounts and provides in pertinent part that a lawyer shall maintain "complete and accurate records of all entrusted property received by the lawyer" and shall "render to the client a written accounting of the receipts and disbursements of all trust funds ... upon the complete disbursement of the trust funds[.]" N.C.R. Prof. Conduct 1.15-3(e), (g). Comment 19 to Rule 1.15-3 explains that the "lawyer is responsible for keeping a client, or any other person to whom the lawyer is accountable, advised of the status of entrusted property held by the lawyer. In addition, the lawyer must take steps to discover any unauthorized transactions involving trust funds as soon as possible."
 

 In this case, the DHC concluded that defendant violated Rule 1.15-2(a) by: (1) moving the Gordons' funds from defendant's trust
 
 *367
 
 account to a CD account at Bank of America; (2) putting the CD account in the name of "Dan L. Merrell, Special Trustee for Development Company of Columbia, LLC;" (3) having Lam's mailing address as the address on the account; (4) using DCC's tax identification number; (5) failing to ensure access to the account was limited to himself; and (6) failing to provide an accounting.
 

 Defendant contends that the evidence is insufficient to support several of the findings of fact supporting the conclusion that defendant violated Rule 1.15-2(a). Defendant first challenges finding of fact 25 that "[t]he address given for the [CD] account was Lam's address, not the Gordons' or Merrell's." Defendant does not dispute that Lam's address is the address associated with the CD account in Bank of America's records. Rather, he argues that Lam's address was put on the account because of the mistaken assumption of William Ashley Gurganus, the Bank of America employee who set up the account, and not because defendant directed the bank to put Lam's address on the account. Defendant points out that the check transferring the funds from his general trust account to the CD account had his address on it and that the assistant who opened the account at defendant's direction testified that she did not provide Bank of America with any other
 
 *112
 
 address. Mr. Gurganus testified that he could not specifically recall where he obtained the address, but that he knew that Lam had other accounts at Bank of America and that Lam was associated with DCC. Even assuming, without deciding, that there is insufficient evidence to support a finding that defendant provided Bank of America with Lam's address for the account, it is undisputed that Lam's address was in fact associated with the account, and defendant took no action to correct it.
 

 Defendant next argues that there is insufficient evidence to support the portion of finding of fact 27 that defendant "knew that withdrawals were made from the CD account without any requirement that [defendant] sign anything." Defendant misinterprets this as a finding that defendant was aware of the unauthorized withdrawals on 27 January and 14 February when they occurred. However, the DHC found in finding of fact 32 that defendant was not aware of those unauthorized withdrawals until September 2006. Finding of fact 27 merely states that defendant was aware that a withdrawal could be made from the CD without his signature. This finding is supported by evidence that defendant was able to withdraw funds from the account on 1 March 2006 and close the account without having to sign anything.
 

 Defendant also challenges finding of fact 31 that the withdrawals on 27 January and 14 February "were for Lam's benefit, including covering
 
 *368
 
 Lam's costs to acquire the Tyrrell County land that he later resold at a higher price to DCC." This finding is supported by ample evidence in the record, including a report of a forensic accounting analysis performed by Derek W. Royster.
 

 Finally, defendant challenges finding of fact 48 that defendant "did not provide the Gordons [with] a written accounting of the receipts and disbursements of the $1.5 million upon the complete disbursement of the funds, nor did he account for the interest earned on the $1.5 million while in the Bank of America CD account." Defendant concedes that he "did not specifically account for the interest earned separate and apart from the principal," but points to evidence that he had his legal assistant send copies of the closing documents, including the HUD statement, to Mr. Nemeroff, the Gordons' legal counsel. These documents, however, only included the final disbursement of the funds for the closing, and did not account for the unauthorized withdrawals made in January and February 2006.
 

 We now turn to the question whether the findings of fact are sufficient to support a conclusion that defendant violated Rule 1.15-2(a). We agree with defendant that moving the Gordons' funds from defendant's general trust account to a CD account at Bank of America, in and of itself, would not have violated the rule. As defendant correctly points out, Rule 1.15 contemplates that funds that are not nominal or short term will be deposited in a dedicated trust account so that the client can earn interest on the funds.
 
 See
 
 N.C.R. Prof. Conduct 1.15-2(b) ("Trust funds placed in a general account are those which, in the lawyer's good faith judgment, are nominal or short-term."); N.C.R. Prof. Conduct 1.15-3, cmt. 3 (funds must be deposited in a general trust account "if there is no duty to invest on behalf of the client" and, in determining whether there is a duty to invest, lawyer should consider, among other factors, amount of funds, duration of the deposit, and interest rate at financial institution where funds are to be deposited).
 

 However, in this case, the evidence shows that when the Gordons transferred their funds to defendant's general trust account, defendant identified the funds in his client ledger as belonging to Lam, not the Gordons. Then, when defendant transferred the funds to the Bank of America CD account, he again misidentified the owner of the funds as DCC, not the Gordons. By labeling the account "Dan L. Merrell, Special Trustee for Development Company of Columbia, LLC" and using DCC's tax identification number, he improperly identified DCC as the owner of the funds. Even assuming, without deciding, that defendant provided his own address, and not Lam's, when creating the account, his mislabeling
 
 *369
 
 of the beneficiary of the account caused employees at the bank to believe that DCC owned the funds in the account and that Lam, as the manager of DCC, was authorized to access the funds in the account.
 
 *113
 
 In other words, defendant did not take any steps to ensure that the bank was aware that the account was a trust account for the benefit of the Gordons and that defendant was the only authorized signatory on the account. This failure led to the funds being misappropriated by Lam. In sum, defendant never notified the Gordons that he had transferred their funds to a different account, did not receive their permission for the transfer, and did not take any steps to ensure that the funds were not misappropriated.
 

 We conclude that these findings of fact are sufficient to support the conclusion that defendant violated Rule 1.15-2(a).
 
 See
 
 N.C.R. Prof. Conduct 1.15-3, cmt. 19 ("The lawyer is responsible for keeping a client, or any other person to whom the lawyer is accountable, advised of the status of entrusted property held by the lawyer. In addition, the lawyer must take steps to discover any unauthorized transactions involving trust funds as soon as possible.").
 

 Defendant next challenges the DHC's conclusion that defendant engaged in a conflict of interest in violation of Rule 1.7(a) by representing both Deepwater and DCC at the 2 March 2006 closing. Although defendant purports to challenge the sufficiency of the evidence to support several of the findings of fact upon which this conclusion is based, his arguments on appeal do not actually challenge the evidentiary basis for the findings, but rather argue the legal significance of the findings and whether they are sufficient to support the conclusion that defendant engaged in a conflict of interest.
 

 Comment 8 to Rule 1.7 explains that "[e]ven where there is no direct adverseness, a conflict of interest exists if a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client may be materially limited as a result of the lawyer's other responsibilities or interests. For example, a lawyer asked to represent a seller of commercial real estate, a real estate developer and a commercial lender is likely to be materially limited in the lawyer's ability to recommend or advocate all possible positions that each might take because of the lawyer's duty of loyalty to the others. The conflict in effect forecloses alternatives that would otherwise be available to the client." Here, the DHC concluded that defendant's representation of DCC was materially limited by his responsibilities to Deepwater because defendant knew that Lam, through Deepwater, had engaged in self-dealing and could not disclose this information to DCC.
 

 *370
 
 Defendant argues that there was no conflict of interest because Lam did not engage in self-dealing. Self-dealing is "[p]articipation in a transaction that benefits oneself instead of another who is owed a fiduciary duty."
 
 Black's Law Dictionary
 
 1481 (9th ed.2009). A fiduciary relationship is "one in which 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence ... and in which there is confidence reposed on one side, and resulting domination and influence on the other.' "
 
 Austin Maint. & Constr., Inc. v. Crowder Constr. Co.,
 

 224 N.C.App. 401
 
 , 408-09,
 
 742 S.E.2d 535
 
 , 541 (2012) (quoting
 
 Dalton v. Camp,
 

 353 N.C. 647
 
 , 651,
 
 548 S.E.2d 704
 
 , 707-08 (2001) ).
 

 "Business partners, for example, are each other's fiduciaries as a matter of law. In less clearly defined situations the question whether a fiduciary relationship exists is more open and depends ultimately on the circumstances. Courts have historically declined to offer a rigid definition of a fiduciary relationship in order to allow imposition of fiduciary duties where justified. Thus, the relationship can arise in a variety of circumstances ... and may stem from varied and unpredictable factors."
 

 Id.
 
 at 409,
 
 742 S.E.2d at 541
 
 (quoting
 
 HAJMM Co. v. House of Raeford Farms,
 

 328 N.C. 578
 
 , 588,
 
 403 S.E.2d 483
 
 , 489 (1991) ).
 

 Defendant argues that Lam did not owe a fiduciary duty to DCC until the Operating Agreement was signed on 1 March 2006. He reasons that the 13 January MOU was nonbinding and argues that there is no evidence that the parties intended the operating agreement to have retroactive effect. However, the DHC found that "[b]y its terms, the operating agreement was effective February 1, 2006." The operating agreement was submitted
 
 *114
 
 into evidence and supports this finding.
 

 An operating agreement is a contract, and this Court has explained that:
 

 "With all contracts, the goal of construction is to arrive at the intent of the parties when the contract was issued. The intent of the parties may be derived from the language in the contract.
 

 It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument. When the language of the
 
 *371
 
 contract is clear and unambiguous, construction of the agreement is a matter of law for the court and the court cannot look beyond the terms of the contract to determine the intentions of the parties."
 

 Bank of Am., N.A. v. Rice,
 

 230 N.C.App. 450
 
 , 455-56,
 
 750 S.E.2d 205
 
 , 209 (2013) (quoting
 
 Stovall v. Stovall,
 

 205 N.C.App. 405
 
 , 410,
 
 698 S.E.2d 680
 
 , 684 (2010) ).
 

 Therefore, when interpreting the terms of a contract, our courts have applied the parol evidence rule.
 

 "The parol evidence rule is not a rule of evidence but of substantive law.... It prohibits the consideration of evidence as to anything which happened prior to or simultaneously with the making of a contract which would vary the terms of the agreement. Generally, the parol evidence rule prohibits the admission of evidence to contradict or add to the terms of a clear and unambiguous contract. Thus, it is assumed the [parties] signed the instrument they intended to sign[,] ... [and, absent] evidence or proof of mental incapacity, mutual mistake of the parties, undue influence, or fraud[,] ... the court [does] not err in refusing to allow parol evidence[.]"
 

 Drake v. Hance,
 

 195 N.C.App. 588
 
 , 591,
 
 673 S.E.2d 411
 
 , 413 (2009) (quoting
 
 Thompson v. First Citizens Bank & Trust Co.,
 

 151 N.C.App. 704
 
 , 708-09,
 
 567 S.E.2d 184
 
 , 188 (2002) ).
 

 Here, the operating agreement plainly states that the agreement "is made effective as of this 1st day of February 2006 by and among the signatories hereto." This language is clear and unambiguous. Defendant has failed to point to any proof of "mental incapacity, mutual mistake of the parties, undue influence, or fraud,"
 

 id.,
 

 with respect to the effective date of the operating agreement. Accordingly, the plain language of the operating agreement controls. The operating agreement was effective beginning 1 February 2006 and prohibited Lam from engaging in self-dealing. It is undisputed that Deepwater's purchase and reselling of the properties to DCC benefitted Lam at the expense of DCC. Accordingly, we hold that the DHC did not err in concluding that Lam engaged in self-dealing when he purchased the properties in February and resold them to DCC for a profit at the 2 March 2006 closing.
 

 Defendant next argues that the parties gave written informed consent to his dual representation at the closing by signing the operating
 
 *372
 
 agreement, which stated, among other things, that "the parties have been advised that a potential conflict exists among their individual interests [.]" Acknowledging that a potential conflict exists, without identifying the potential conflict, does not provide the parties with informed consent.
 
 See
 
 Comment 18 to Rule 1.7 ("Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client."); Comment 19 to Rule 1.7 ("Under some circumstances it may be impossible to make the disclosure necessary to obtain consent. For example, when the lawyer represents different clients in related matters and one of the clients refuses to consent to the disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent."). In this case, the parties could not give informed consent of dual representation without full disclosure from Lam.
 

 Furthermore, the DHC's conclusion that defendant's dual representation created a conflict of interest is consistent with 2015 Formal Ethics Opinion 14 ("2015 FEO 14"), which held that in most instances, common
 
 *115
 
 representation in a commercial real estate closing is a "nonconsentable" conflict. "While not precedential authority for this Court, formal ethics opinions, as defined in the Procedures for Ruling on Questions of Legal Ethics of the North Carolina State Bar, 'provide ethical guidance for attorneys and to establish a principle of ethical conduct.' "
 
 N.C. Baptist Hosps., Inc. v. Crowson,
 

 155 N.C.App. 746
 
 , 752 n. 5,
 
 573 S.E.2d 922
 
 , 925 n. 5 (J. Campbell dissenting) (quoting 27 N.C. Admin. Code 1D.0101(10) (2001) ),
 
 aff'd per curiam,
 

 357 N.C. 499
 
 ,
 
 586 S.E.2d 90
 
 (2003). Thus, this Court has looked to formal ethics opinions for guidance when determining whether an attorney has violated the Rules of Professional Conduct.
 
 See, e.g.,
 

 Nationwide Mut. Fire Ins. Co. v. Bourlon,
 

 172 N.C.App. 595
 
 , 602-03,
 
 617 S.E.2d 40
 
 , 45-46 (2005) (when reviewing plaintiff's argument that attorney breached attorney-client relationship, citing formal ethics opinions in support of conclusion that attorney-client relationship existed),
 
 aff'd per curiam,
 

 360 N.C. 356
 
 ,
 
 625 S.E.2d 779
 
 (2006).
 

 Here, although 2015 FEO 14 did not come out until 23 January 2015, its reasoning is persuasive. The opinion cites
 
 Baldasarre v. Butler,
 

 132 N.J. 278
 
 , 295-96,
 
 625 A.2d 458
 
 , 467 (1993), in which the Supreme Court of New Jersey held that an attorney may not represent both the buyer and seller in a complex commercial real estate transaction even if both parties give their informed consent:
 

 The disastrous consequences of [the lawyer's] dual representation convinces us that a new bright-line rule
 
 *373
 
 prohibiting dual representation is necessary in commercial real estate transactions where large sums of money are at stake, where contracts contain complex contingencies, or where options are numerous. The potential for conflict in that type of complex real estate transaction is too great to permit even consensual dual representation of buyer and seller.
 

 Formal Ethics Opinion 14 concludes:
 

 [D]ual representation of the borrower and the lender for the closing of a commercial real estate loan is a nonconsentable conflict of interest unless the following conditions can be satisfied: (1) the contractual terms have been finally negotiated prior to the commencement of the representation; (2) there are no material contingencies to be resolved; (3) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (4) it is unlikely that a difference in interests will eventuate and, if it does, it will not materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that should be pursued on behalf of a client; (5) the lawyer reasonably concludes that he will be able to act impartially in the representation of both parties; (6) the lawyer explains to both parties that his role is limited to executing the tasks necessary to close the loan and that this limitation prohibits him from advocating for the specific interests of either party; (7) the lawyer discloses that he must withdraw from the representation of both parties if a conflict arises; and (8) after the foregoing full disclosure, both parties give informed consent confirmed in writing.
 

 Defendant has failed to show that these conditions were satisfied in this case. Significantly, the DHC's findings, which we have held are supported by the evidence in the record, show that defendant had obtained information through his representation of Lam and Deepwater that would have been material to DCC in determining whether to go forward with the closing and that defendant failed to disclose to DCC before representing both DCC and Deepwater in the closing. There can be no question that a conflict of interest arises when an attorney obtains information through his representation of one party that is material to the attorney's representation of a second party, and the attorney cannot or
 
 *374
 
 does not disclose that information to the second party.
 
 See
 

 In re Shay,
 

 756 A.2d 465
 
 , 476 (D.C.2000) (holding attorney's "duties to her respective clients ... were irreconcilable and resulted in a conflict of interest" where attorney drafted will for one client and did not disclose material information, obtained from a second client, which was necessary for first
 
 *116
 
 client to make informed decision regarding disposition of property);
 
 Matter of LaVigne,
 

 146 N.J. 590
 
 , 607,
 
 684 A.2d 1362
 
 , 1371 (1996) ("Respondent engaged in an impermissible conflict of interest, in violation of
 
 RPC
 
 1.7(b) and (c), by his representation of the seller and two separate sets of purchasers when his own pecuniary interest materially limited his ability to counsel his clients. He failed fully to disclose and explain the nature of the conflict to the respective purchasers and lenders and made no effort to obtain their express consent to his multiple representation, in violation of
 
 RPC
 
 1.7(b).").
 

 In short, we hold that there is sufficient evidence to support the DHC's finding of fact that Lam engaged in a conflict of interest and failed to provide full disclosure of his actions to the other members of DCC. These findings, in turn, support the DHC's conclusion that defendant engaged in a conflict of interest in violation of Rule 1.7(a) because defendant's representation of DCC at the closing was materially limited by his responsibilities to Deepwater and he had not obtained written informed consent to the dual representation.
 

 AFFIRMED.
 

 Judges ELMORE and DILLON concur.