Fiske v. Kieffer, 2016 NCBC 12.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15-CVS-11575

JOHN FISKE, JEFFREY SMALL,
NABIL BOUTROS AND STEPHEN
SMALL,
              Plaintiffs,

        v.

MARC KIEFFER,
              Defendant.

)
)
)
)
)
)
)
)
)
)
)

**OPINION AND ORDER**

THIS CAUSE was designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases.

THIS MATTER comes before the Court upon Defendant's Motion for Judgment on the Pleadings ("Defendant's Motion") and Plaintiffs' Motion for Judgment on the Pleadings ("Plaintiffs' Motion") (collectively, "Motions"), pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure ("Rule(s)").

THE COURT, after considering the Motions, the briefs in support of and in opposition to the Motions, and other appropriate matters of record, CONCLUDES as stated herein.

*Raynor Law Firm, PLLC, by Kenneth R. Raynor, Esq., for Plaintiffs.*

*James, McElroy & Diehl, P.A., by Fred B. Monroe, Esq., for Defendant.*

McGuire, Judge.

FACTUAL BACKGROUND

1.      This dispute arises out of the interpretation and enforcement of the identical operating agreements of three North Carolina limited liability companies (collectively

referred to as the "Operating Agreements"): Rockin Gelt, LLC, Sockin Gelt, LLC, and Makhn Gelt, LLC (collectively, the "LLCs").[1] John Fiske, Jeffrey Small, Nabil Boutros, and Stephen Small ("Plaintiffs"), and Marc Kieffer ("Defendant") constitute all of the Members of each of the three LLCs.[2] The parties' respective ownership interests are structured identically in each of the LLCs as follows: Marc Kieffer: 40%, Stephen Small: 20%, Nabil Boutros: 20%, Jeffrey Small: 10%, and John Fiske: 10%.[3]

2. Initially, the Managers of each of the LLCs were Plaintiff Stephen Small and Defendant. On or about January 6, 2015, Plaintiffs terminated Defendant as a Manager of the LLCs.[4] Stephen Small is currently the sole Manager of the LLCs.[5]

3. Plaintiffs and Defendant engaged in numerous negotiations over whether Defendant would acquire the membership interests of the Plaintiffs in the LLCs, or vice-a-versa.[6] Despite several tentative offers back and forth between Plaintiffs and Defendant, the parties could not reach an agreement on the sale of Plaintiffs' interests in the LLCs to Defendant.[7]

4. On or about April 6, 2015, RJG Restaurant Group, LLC ("RJG"), a third-party, delivered a non-binding letter of intent concerning the potential purchase of the assets of the LLCs.[8] Defendant objected to the proposed sale to RJG and took the position that under the

---

[1] The Operating Agreements of the three LLCs are attached to Defendant's Counterclaim as Exhibits B, C, and D.
[2] Am. Comp. ¶¶ 5, 20, 35.
[3] Def.'s Countercl. ¶ 8.
[4] Def.'s Br. Supp. Mot. J., pp. 2.
[5] *Id.*; The Operating Agreements provide that "the LLC shall initially have two (2) Managers" and provides for the removal and replacement of Managers. §5.1(a). The Operating Agreements consistently use the plural "Managers", but the agreements do not specify that the LLCs must always have two Managers or that there must be any minimum number of Managers. Stephen Small apparently acted as the LLCs only Manager following Defendant's removal. The parties do not appear to dispute that the LLCs could properly be managed by a single Manager.
[6] Def.'s Countercl. ¶ 15.
[7] *Id.* at ¶ 17.
[8] *Id.* at ¶ 19.

Operating Agreements of each LLC, the Manager did not have the authority to sell the assets of the LLCs without the unanimous consent of all of the Members.[9] RJG Restaurant Group, LLC withdrew their letter of intent upon learning Defendant's position concerning the Manager's authority to sell all of the LLCs' assets.[10]

5. The Operating Agreements contain identical provisions concerning the authority of the Managers.[11] Article V of each Operating Agreements governs the role of the Managers of the LLCs. Section 5.1 provides for the general authority of the Manager, in pertinent part, as follows:

> (b) <u>General Authority of Managers.</u> Except as set forth in the those provisions of this Agreement that specifically require the vote, consent, approval or ratification of the Members or of the Interest Holders and except as set forth in Section 5.2 below, the Managers shall have complete authority and exclusive control over the management of the business and affairs of the LLC.
>
> . . .
>
> Without limiting the generality of the foregoing, the Managers shall have the authority, if, as and when they deem necessary or appropriate, subject only to the express terms, conditions, and limitations of this Agreement and to such additional restrictions, terms, and conditions as may be imposed by the unanimous resolution of the Members from time to time, to take any of the actions listed below on behalf of the LLC:
>
> . . .
>
> (iv) <u>Exercise Rights of Ownership</u>. Exercise all the LLC's rights, powers, and privileges of ownership with respect to the assets of the LLCs, and any other rights held by the LLC, including the transfer of title to all or any portion of the assets of the LLC.
>
> . . .
>
> (vi) <u>Convey and Encumber Assets.</u> Execute in furtherance of any or all of the purposes of the LLC any deed, lease, deed of trust, mortgage, promissory note, bill of sale, assignment, contract, or other instrument purporting to convey or encumber LLC assets or to create indebtedness of the LLC.

---

[9] *Id.* at ¶ 13-14.
[10] *Id.* at ¶ 15.
[11] Rockin Gelt, LLC, Op. Ag.; Sockin Gelt, LLC, Op. Ag.; Makhn Gelt, LLC, Op. Ag.

6.      Section 5.2 of the Operating Agreements restricts the authority of the Manager

as follows:

(a) Supermajority[12] Consent Required.      Without      the      consent      of      a
Supermajority of the Members, no Manager, Interest Holder, or Person to
whom the Managers have delegated authority shall have the authority to do,
or to cause the LLC to do, any of the following:

(i)      any act in contravention of this Agreement, including without
limitation conducting any business in contravention of Section 1.3
above;

(ii)      amend this Agreement, except as expressly provided otherwise
herein;

(iii)      possess any property or assign, transfer, or pledge any right of
the LLC in any property other than for the benefit of the LLC;

(iv)      employ, or permit to be employed, the funds or assets of the
LLCs in any manner except for the benefit of the LLC;

(v)      commingle the LLC's funds with any other Person's funds;

(vi)      cause IRS Form 8832 to be filed or knowingly take any other
action resulting in the LLC's taxation for federal income tax purposes
as a corporation or as an association taxable as a corporation;

(vii)      merge the LLC with any other Person, or dissolve the LLC;

(ix)      guaranty any obligation or liability of a third Person;

(x)      confess judgment or settle or compromise litigation or any claim
exceeding Fifty Thousand Dollars ($50,000); or

(xi)      enter into or modify, amend, terminate, waive, or release any
material agreement or obligation to a Member or Manager note
expressly provided herein or pursuant to a supermajority consent of the
Members.

7.      Section 9.1 of the Operating Agreements enumerates events that will be

considered "Dissolution Triggers."  Each of the Operating Agreements contains the following

pertinent provisions:

The LLC shall dissolve only upon the first to occur of any of the
following events:

. . .

(d) The sale of all or substantially all of the assets of the LLC in a single
transaction or in a series of related transactions, unless within forty-five (45)
days following sale transaction(s) there is a Supermajority Vote of the
Members to continue the LLC without dissolution.

---

[12] Exhibit C to the Operating Agreements is a "Glossary" which defines a "Supermajority Vote" as "the
written vote, consent or approval of at least seventy five per cent [*sic*] (75%) in Interest of the
Members."

8. On June 17, 2015, Plaintiffs filed the Complaint, and on June 23, 2015, they filed an Amended Complaint. The Amended Complaint raised three identical claims for declaratory judgment asking the Court "to determine whether the Manager of" the three LLCs is "allowed to sell all of the assets of" the LLCs "with approval of only a majority of the members of the company (Counts I, II, and III)."[13]

9. On August 27, 2015, Defendant filed his Answer, Defenses and Counterclaims. Defendant raised a counterclaim for declaratory relief asking the Court to "interpret the operating agreements [of the three LLCs] … and find that a Supermajority Vote is required by the Members of the LLC[s] to sell any and all of the assets" (First Cause of Action).[14] Defendant also counterclaims for breach of fiduciary duty/constructive fraud (Second Cause of Action) and breach of contract (Third Cause of Action).[15]

10. On October 28, 2015, Defendant filed a Motion for Judgment on the Pleadings under Rule 12(c) seeking judgment in Defendant's favor on Plaintiffs' claims for declaratory relief (Counts I, II, and III) and on Defendant's counterclaim for declaratory relief (First Cause of Action).

11. On November 12, 2015, Plaintiffs filed a Motion for Judgment on the Pleadings under Rule 12(c) seeking judgment in their favor on Defendant's counterclaims for declaratory relief (First Cause of Action) and on Plaintiffs' claims (Counts I, II and III).

12. The Motions have been fully briefed and are ripe for determination.

ANALYSIS

13. "Motion for judgment on the pleadings is authorized by Rule 12(c) of the North Carolina Rules of Civil Procedure. . . . The rule's function is to dispose of baseless claims or

---

[13] Am. Comp. ¶¶ 18, 33, and 48.
[14] Countercl. ¶ 40.
[15] *Id.* ¶¶ 41-54.

defenses when the formal pleadings reveal their lack of merit." *Ragsdale v. Kennedy*, 286 N.C. 130, 136-37 (1974) (internal citations omitted). "A motion for judgment on the pleadings is the proper procedure when all the material allegations of fact are admitted in the pleadings and only questions of law remain. When the pleadings do not resolve all the factual issues, judgment on the pleadings is generally inappropriate." *Id.* The Court may only consider "the pleadings and exhibits which are attached and incorporated into the pleadings." *Davis v. Durham Mental Health/Dev. Disabilities/Substance Abuse Area Auth.,* 165 N.C. App. 100, 104 (2004) (internal quotation marks and citation omitted). The Court must "view the facts and permissible inferences in the light most favorable to the nonmoving party." *Ragsdale,* 286 N.C. at 137. Thus, a Rule 12(c) motion for judgment on the pleadings should be denied "unless it is clear that plaintiff is not entitled to any relief under any statement of the facts." *Praxair, Inc. v. Airgas, Inc.,* 1999 NCBC LEXIS 5, at *8 (N.C. Super. Ct. 1999).

14.     Under North Carolina law, a declaratory judgment is a statutory remedy that grants a court the authority to "declare rights, status, and other legal relations" when an "actual controversy" exists between parties to a lawsuit. G.S. § 1-253; *Pine Knoll Shores v. Carolina Water Serv., Inc.*, 128 N.C. App. 321, 321 (1998). A party to a written contract "may have determined any question of construction or validity arising under" the contract. G.S. § 1-254. Rule 12(c) can be an appropriate vehicle for granting judgment is a case such as this one where there are not disputes of fact, but merely questions of law. *See Ragsdale*, 286 N.C. at 136-37.

15.     Plaintiffs and Defendant make competing claims for declaratory relief seeking the Court's determination of the Manager's authority to sell the assets of the LLCs under the Operating Agreements. Defendant contends that the Operating Agreements provide that the Manager may only sell the assets of the LLCs with the approval of a Supermajority vote of the Members. Plaintiff's contention is less clear. The Amended Complaint seeks declarations

that the Operating Agreements give the Manager authority to sell the assets of the LLCs "with approval of only a majority of the members of as opposed to the unanimous approval of the members as contended by Defendant."[16]  Defendant, however, does not contend that a unanimous vote is required, but only a Supermajority vote.  On the other hand, Plaintiffs' Motion asks for a declaration that "the managers of the respective companies can sell all or some of the assets . . . without obtaining the consent of a Supermajority of the membership."[17]  Plaintiffs' brief in support of its Motion also characterizes the issue upon which Plaintiff seeks the declarations as "whether the . . . three operating agreements require a supermajority vote of the members to approve the sale of all or substantially all of the assets."[18]  The Operating Agreements do not appear to require a majority (as opposed to a Supermajority) vote of the LLCs' Members to approve any actions by the Manager, but section 5.2 does require Supermajority approval for certain actions. The party's allegations and briefing make it clear that the dispute between them centers on whether Defendant, with his 40% membership interest, can block the Manager's sale of the LLCs' assets by preventing Supermajority approval.  Accordingly, the Court concludes that the issue for determination is whether the Operating Agreements require a Supermajority vote of the Members to approve a decision by the Manager to sell all of substantially all of the assets of the LLCs.

16.     "An [LLC] operating agreement is a contract . . . [and w]ith all contracts, the goal of construction is to arrive at the intent of the parties when the contract was issued. The intent of the parties may be derived from the language in the contract." *N.C. State Bar v. Merrell*, ___ N.C. App. ___ , 777 S.E.2d 103, 114 (2015). "When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court." *Id.*

---

[16] Am. Comp. ¶¶ 17, 32, and 47.
[17] Pls.' Rule 12(c) Mot.
[18] Pls.' Br. Supp. Mot. J. pp. 1-2.

(citations omitted); *Lynn v. Lynn*, 202 N.C. App. 423, 431 (2010). The North Carolina Court of Appeals also has held that:

> The goal of construction is to arrive at the intent of the parties when the contract was written. North Carolina courts adhere to the central principle of contract interpretation that the various terms of the contract are to be harmoniously construed, and if possible, every word and every provision is to be given effect. It is presumed that each part of the contract means something.

*WakeMed v. Surgical Care Affiliates*, LLC, __ N.C. App. __, at __, 778 S.E.2d 308, 312 (2015) (quotations and citations omitted).

17. In addition, Section 11.3 of the Operating Agreements expressly requires that "any court . . . shall construe every covenant, term and provision of this Agreement in accordance with its simple and fair meaning and not strictly for against any [Member]."

18. Both parties contend that the language in the Operating Agreements is unambiguous, but urge very different interpretations of that language. Plaintiffs assert that section 5.1(b) gives the Manager unrestricted authority to sell all or substantially all of the LLCs' assets without approval of a Supermajority of the Members. They argue that neither section 5.2 nor any other provision of the Operating Agreements requires Supermajority approval of the sale of assets. Defendant disagrees, and argues that various provisions of the Operating Agreements, including section 5.2, require that the Manager obtain approval of a Supermajority of the Members to sell all of substantially all of the assets of the LLCs. There are no facts in dispute that would preclude the Court from entering a declaratory judgment interpreting the Operating Agreements. Accordingly, the Court will turn to the language of the agreements.

19. Section 5.1(b) of the Operating Agreements provides that "except as set forth in those provisions of this Agreement that specifically require the vote, consent, approval or ratification of the Members . . . and except as set forth in Section 5.2 below, the Managers shall have complete authority and exclusive control over the management of the business

and affairs of the LLC." Section 5.1(b) also gives the Manager specific authority to "[e]xercise all the LLC's rights, powers, and privileges of ownership with respect to assets of the LLC, . . . , including the transfer of title to all or any portion of the assets of the LLC" and to "[e]xecute in furtherance of any or all of the purposes of the LLC any . . . , bill of sale, assignment, contract or other instrument purporting to convey . . . LLC assets."

20. Section 5.2 of the Operating Agreements provides that certain specific actions by the Manager require "the consent of a Supermajority of the Members." Section 5.2 does not contain specific reference to the "sale" of the LLCs' "assets."

21. Defendant, however, contends that various provisions of the Operating Agreements, including section 5.2, establish that the Manager must have the consent of a Supermajority of Members to sell the LLCs' assets. Defendant cites the first clause of section 1.3, which states that "[t]he purposes of the LLC are (i) to operate a restaurant and conduct all lawful businesses and investments as the Members shall determine by Supermajority Vote." Defendant argues that the first clauses must be read to mean that "[for] any of the LLCs to have any business purpose other than the operation of a Mellow Mushroom pizza restaurant, a Supermajority Vote of the Members is required."[19] Setting aside the fact that the Agreements refer only to operation of a restaurant and not specifically a Mellow Mushroom, even if Defendant's interpretation is correct, the action at issue in this lawsuit is the Manager's decision to sell the assets of the LLCs, not to engage in a non-restaurant business. The first clause of section 1.3 has no application to the decision to sell the assets.

22. Defendant's interpretation also ignores the rest of the language of section 1.3 and misconstrues its meaning. Section 1.3 is merely a general purpose statement intended to vest the LLC with the broad flexibility permitted by the LLC Act. For example, section

---

[19] Def.'s Br. Supp. Mot. J. pp. 7-8.

1.3 specifically provides that another purpose of the LLCs is to "dispose of all property or assets or interests in property or assets as may be necessary, appropriate or convenient to accomplish the activities described in clause (i) above," and "to conduct such other activities necessary or incidental to" the purposes of the LLCs. Accordingly, among the specific purposes of the LLCs is to take such actions, including disposing of all the LLCs' assets, if it becomes "necessary, appropriate or convenient." In other words, the plain language of section 1.3 is intended to permit such actions as become necessary and prudent to the conduct of the LLCs' businesses, including liquidation of their assets.[20]

23.     Defendant next argues that section 5.2(viii), which requires Supermajority consent for the Manager to "dissolve the LLC," when read in conjunction with section 9.1, requires Supermajority approval for the sale of all of the LLCs' assets.[21] Section 9.1(d) provides that the LLCs "shall dissolve" upon "[t]he sale of all or substantially all of the assets of the LLC . . ., unless within forty-five (45) days following sale transaction(s) there is a Supermajority Vote of the Members to continue the LLC without dissolution." Defendant contends that because the sale of all of the assets of the LLCs triggered dissolution under section 9.1(d), the Manager was required to obtain Supermajority consent to sell the assets. Again, Defendant misconstrues these provisions. Section 9.1(d) does not explicitly or implicitly require Supermajority consent in order for the Manager to sell the LLCs' assets. Rather, the plain language of that provision makes clear that in the event of the sale of the assets that results in dissolution, the Members have the authority to keep the LLC in existence. The structure of section 9.1(d) supports this interpretation as it envisions a period

---

[20] As Plaintiffs suggest, Defendant's interpretation of the first clause of section 1.3 would seemingly require the four Plaintiffs to continue operating a very unprofitable restaurant business if Defendant chose to vote against ceasing business since Defendant held a 40% interest in the LLCs and could block a Supermajority. Pls.' Br. Supp. Mot. J. pp. 11-12. Defendant's interpretation not only would lead to this absurd result, it also flies in the face of the remainder of section 1.3.

[21] Def.'s Br. Supp. Mot. J. pp. 8-10.

of 45 days *following* a sale of the assets that triggers a dissolution for the Members to determine whether the LLC should continue to exist, perhaps even for the purpose of acquiring new assets to operate a restaurant business. The Court concludes that the plain language of this section, given its "simple and fair meaning," does not require Supermajority approval for the sale of the LLCs' assets.

24.     Finally, Defendant contends that sections 5.2(a)(iii) and 5.2(a)(iv) of the Operating Agreements restrict the Manager from taking certain actions that are not "for the benefit of the LLC" without first obtaining Supermajority approval.[22] Neither of the provisions expressly address the sale or transfer of the LLCs' "assets," and Defendant does not argue how they would apply to a sales of assets. Section 5.2(a)(iv) requires the Manager to obtain Supermajority consent to "employ, or permit to be employed, the funds or assets of the LLC in any manner except for the benefit of the LLC." The word "employ" is not defined in the Operating Agreements. In its everyday usage, however, the word "employ" means "to make use of; to use or occupy."[23] The word "employ" does not connote the sale or transfer of title to the assets. Rather, section 5.2(a)(iv) appears to restrict the Manager from permitting the LLCs' assets, from being used by a third party or being used in some other manner that does not result in revenues or other benefits being generated for the LLCs. The Court concludes from the plain language used that this provision was not intended to apply to a sale or transfer of the LLCs' assets.

25.     Section 5.2(a)(iii), however, requires the Manager to obtain Supermajority approval to "assign, transfer, or pledge any right of the LLC in any property other than for the benefit of the LLC." This provision does not make clear what constitutes the "right of the LLC in any property," nor do the Operating Agreements define the word "property." The

---

[22] *Id.* at p. 10.
[23] Webster's Third New International Dictionary (2002, Merriam-Webster Incorporated).

agreements, however, seemingly use the words "property" and "assets" to mean the same thing. Section 1.3(ii) uses the terms property and assets interchangeably, stating that one of the LLCs' purposes is to "dispose of all *property or assets or interests in property or assets* as may be necessary." (emphasis added). Section 5.1(b)(iii) is entitled "Acquire and Construct Assets" and provides that the Manager shall have authority to "enter into and execute agreements for the acquisition of *real and personal property*." (emphasis added). Similarly, section 5.1(b)(vi), provides the Manager authority to "Convey and Encumber Assets" grants the Manager authority to "execute . . . any deed, lease, deed of trust, mortgage, promissory note, bill of sale, assignment, contract or other instrument purporting to convey or encumber LLC assets." The terminology used refers to instruments used to convey and encumber real property (e.g., deed of trust, mortgage) and personal property (e.g., bill of sale). These provisions support the interpretation that parties intended the word "assets" to have the same meaning as "property," both real and personal.

26.     The Court concludes that the parties intended for the words "assets" and "property" to have the same meaning when used in the agreements. Accordingly, section 5.2(a)(iii), which requires the Manager to obtain Supermajority approval to sell the "right of the LLC in any property" if the sale is "other than for the benefit of the LLC," imposes a restriction on the Managers' authority to sell or transfer the LLCs' assets. Approval of a Supermajority of the members is not required where the sale the LLCs' assets is for the benefit of the LLC, but is required where the sale is not for benefit of the LLCs. Such a requirement would necessarily require the Manager to obtain Supermajority approval for the sale of all or substantially all of the LLC's assets if the sale is "other than for the benefit of the LLC."

27.     This interpretation also adheres to a "central principle" of contract interpretation by harmonizing and giving effect to both sections 5.1(b)(iv) and 5.2(a)(iii).  *In*

*re Foreclosure of a Deed of Trust,* 210 N.C. App. 409, 415 (2011). There is nothing inconsistent in granting the Managers broad authority over the LLC assets or property, but requiring the Manager to seek approval of for a sale or transfer of property that does not clearly benefit the LLC. In fact, it would seem illogical that the Members of the LLCs intended to give the Manager unfettered authority to take an action potentially detrimental to the Members' interests without their consent.

28.     In summary, the Court concludes that the Operating Agreements, read as whole documents and harmonizing and give meaning to each separate provision, establish that the Operating Agreements authorize the Managers to sell all or substantially all of the assets of the respective LLCs without the approval of a Supermajority vote of the members if the sale is for the benefit of the LLC. The Managers must obtain approval of a Supermajority vote of the members to sell all or substantially all of the assets of the respective LLCs if the sale is not for the benefit of the LLC.[24]

THEREFORE, IT IS ORDERED that:

29.     Defendant's Motion for Judgment on the Pleadings seeking judgment in Defendant's favor on Plaintiffs' claims for declaratory relief (Counts I, II, and III) and on Defendant's counterclaim for declaratory relief (First Cause of Action) is GRANTED in part and DENIED in part consistent with declaration issued below.

30.     Plaintiffs' Motion for Judgment on the Pleadings seeking judgment in their favor on Plaintiffs' claims (Counts I, II and III) and on Defendant's counterclaims for

---

[24] The Court recognizes the practical implication of this construction of sections 5.1 and 5.2 means that Defendant, as a 40% interest holder in each of the LLCs, can block any sale of assets by claiming that a sale is not for the benefit of the LLC, and if the other members disagree, by filing a lawsuit seeking declaratory or other relief. The Court has not been called upon in these motions to consider whether Defendant must make a claim that a sale of assets in not for the benefit of the LLC in good faith, and whether the absence of good faith would expose Defendant to liability to the other members.

declaratory relief (First Cause of Action) is GRANTED in part and DENIED in part consistent with declaration issued below.

31.     The Court enters the following DECLARATORY JUDGMENT pursuant to G.S. § 1-254:

> The Operating Agreements of Rockin Gelt, LLC, Sockin Gelt, LLC, and Makhn Gelt, LLC authorize the Managers to sell all or substantially all of the assets of the respective LLCs without the approval of a Supermajority vote of the members if the sale is for the benefit of the LLC.  The Managers must obtain approval of a Supermajority vote of the members to sell all or substantially all of the assets of the respective LLCs if the sale is not for the benefit of the LLC.

This the 16th day of February, 2016.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
  for Complex Business Cases
