Richardson v. Kellar, 2016 NCBC 60.

STATE OF NORTH CAROLINA　　　　　IN THE GENERAL COURT OF JUSTICE
　　　　　　　　　　　　　　　　　　　　SUPERIOR COURT DIVISION
COUNTY OF GASTON　　　　　　　　　　16 CVS 1126

| | | |
|---|---|---|
| DR. CHARLES RICHARDSON and | ) | |
| TRANSWORLD MED, LLC, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER ON MOTION FOR** |
| | ) | **PRELIMINARY INJUNCTION** |
| FRANZ KELLAR, RED RAVEN, LLC, and | ) | |
| TRANSWORLD MEDICAL DEVICES, LLC, | ) | |
| Defendants. | ) | |

THIS MATTER comes before the Court on Plaintiffs Dr. Charles Richardson ("Richardson") and TransWorld Med, LLC's ("TW Med") Motion for Preliminary Injunction (the "Motion"). On July 20, 2016, the Court held a hearing on the Motion.

THE COURT, having considered the Motion, briefs in support of and opposition to the Motion, the record evidence filed by the parties, and other appropriate matters of record, FINDS and CONCLUDES as follows.

FACTUAL AND PROCEDURAL BACKGROUND

1.　　　Plaintiff Richardson is a medical doctor involved in scientific education and the development of medical devices and biotechnology products.[1]

2.　　　Plaintiff TW Med is a North Carolina limited liability company whose sole member is Richardson (TW Med and Richardson, collectively, will be referred to as "Plaintiffs"). TW Med has a 50% ownership interest in Defendant TransWorld Medical Devices, LLC ("TW Devices").[2]

---

[1] Compl. ¶ 1.
[2] *Id.* at ¶¶ 2, 7.

3. Defendant Franz Kellar ("Kellar") is a citizen and resident of Gaston County, North Carolina, also involved in the development of medical devices and biotechnology products.[3]

4. Defendant Red Raven, LLC, ("Red Raven") is a North Carolina limited liability company whose sole member is Kellar (Red Raven and Kellar, collectively, will be referred to as "Defendants"). Red Raven also has a 50% ownership interest in TW Devices.[4]

5. In July 2007, Richardson and Kellar formed TW Devices through their respective entities as a North Carolina limited liability company. Plaintiffs allege TW Devices "was formed to manufacture and sell blood pumps for the heart called the Total Artificial Heart (TAH), Left Ventricle Assistance Device (LVAD), and Right Ventricle Assistance Device (RVAD)."[5] As noted, Richardson owns 50% of TW Devices through TW Med, and Kellar owns the remaining 50% though Red Raven.[6]

6. Richardson and Kellar entered into the Operating Agreement for TW Devices effective September 30, 2007 (the "Operating Agreement").[7] The Operating Agreement provided for a two member board of managers ("Board").[8] Section 4.1(b), in turn, provides that:

> The members of the Board (each a "*Manager*") shall constitute the Company's managers for all purposes under the Act and other applicable law; provided; however, that notwithstanding the foregoing, without being authorized by the Board, no individual Manager shall (i) have authority to bind the Company or (ii) otherwise be entitled to sign for or take any action on behalf of the company.[9]

---

[3] *Id.* at ¶ 3.
[4] *Id.* at ¶¶ 4, 8. At the July 20, 2016, hearing, all parties agreed that named Defendant TransWorld Medical Devices, LLC, would serve only as a nominal defendant and thus need not be represented by counsel in this matter. Therefore, the assertions attributed to "Defendants" include only those made by counsel for Kellar and Red Raven.
[5] Compl. ¶ 9.
[6] *Id.* at ¶¶ 7, 8.
[7] *Id.,* Exh. A.
[8] TW Devices Operating Agreement §4.2.
[9] *Id.* at § 4.1(b).

Pursuant to the Operating Agreement, TW Medical appointed Richardson as a member of the TW Devices Board, and Red Raven appointed Kellar.[10] The Operating Agreement further established that Richardson would serve as Chairman of the Board.[11]

7.  The Operating Agreement vested the Board with broad authority to manage TW Devices as follows:

> Except as otherwise expressly provided in this Agreement (including without limitation Section 4.8) or the Act, the board of managers (the "*Board*") shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as they deem necessary or appropriate to accomplish the purposes and direct the affairs of the Company. In managing the business and affairs of the Company and exercising its powers granted hereunder, the Board must act either through a meeting pursuant to Section 4.7(a) or through a written consent in lieu thereof pursuant to Section 4.7(c).[12]

8.  The Operating Agreement also established Kellar as the President and Chief Executive Officer of TW Devices.[13] The Operating Agreement did not enumerate the rights and duties of officers, but provided in relevant part:

> Any officer . . . shall have only such authority and perform such duties as the Board may, from time to time, expressly delegate to them . . . . Unless the Board otherwise determines, if the title assigned to an officer of the Company is one commonly used for officers of a business corporation formed under the North Carolina Business Corporation Act, then the assignment of such title shall constitute the delegation to such officer of the authority and duties that are customarily associated with such office, including the authority and duties that a President may assign to such other officers of the Company under the North Carolina Business Corporation Act . . . .[14]

The Operating Agreement expressly limited an officer's authority to take certain actions without approval of the Board, including "sell[ing] any asset . . . of the Company, if

---

[10] *Id.* at § 4.3(a).
[11] *Id.* at § 4.5.
[12] TW Devices Operating Agreement § 4.1(a) (emphasis in original).
[13] *Id.* at § 4.12(b).
[14] *Id.* at § 4.12(a).

the aggregate amount of consideration paid for such asset is in excess of $50,000."[15]  It is undisputed that the Board did not expressly delegate any responsibilities or authority to Kellar as President and CEO.[16]

9.      The 2007 Operating Agreement stated that TW Devices' "business purpose" was "to engage in (a) the Specific Company Purpose and (b) any lawful activity for which limited liability companies may be organized under the Act."[17]  The Operating Agreement defines "Specific Company Purpose" as "the conception, design, production, sales and promotion of (1) pulmonary heart valve; (2) biomarker hardware and biomarkers; (3) microrobotic devices for surgical applications; (4) LVAD, RVAD and TAH; and (4) [*sic*] remote medical power transmission devices."[18]  In July 2012, TW Devices' "Specific Company Purpose" was amended to "the conception, design, production, sales and promotion of the following mechanical heart assist devices; LVAD (left ventricular assist device), RVAD (right ventricular assist device) and TAH (total artificial heart)."[19]

10.     In December, 2007, The Cleveland Clinic Foundation ("CCF") and TW Devices formed Cleveland Heart, Inc. ("CHI").  Initially, CHI was owned by CCF and TW Devices. CHI's purpose was to design, manufacture, and sell three devices for patients with irreversible end-stage heart failure: the TAH, LVAD and RVAD.

11.     The parties dispute who initially held the position of CEO for CHI.  Plaintiff alleges he was CEO of CHI until August 2014,[20] and that Kellar was Chief Operating

---

[15] *Id.* at § 4.12(a)(v).
[16] While not directly addressed by materials contained in the record, both parties admitted this to be the case at the July 20, 2016 hearing.
[17] TW Devices Operating Agreement, § 2.4.
[18] *Id.* under Article 1, Definitions, "Specific Company Purpose."
[19] TW Devices First Am. Operating Agreement ¶ 1.
[20] Richardson Aff. ¶ 17

Officer.[21] Kellar, on the other hand, contends that he was CHI's initial CEO.[22] Defendants represent that Kellar, in his capacity as CEO, "directed the activities of CHI . . . [d]uring its first 4½ years [in which] CHI raised capital and began developing the cardiac circulatory assist devices."[23] In any event, Defendants allege, and Plaintiffs do not seem to dispute, that "[a]s of July 2012, CHI had met several milestones in the development of its products but needed additional cash to continue developing its products."[24]

12. Accordingly, in July 2012, CHI agreed to sell $30 million of new CHI stock to Wizit Power Heart Health Consortium, Inc. ("Wizit") in four installments.[25] As a condition of purchasing the stock, Wizit requested that CHI appoint Richardson CEO, President, and Chairman of the Board.[26] In addition, Wizit was given two seats on CHI's board of directors in place of two incumbent directors, one of whom was Kellar.[27] Ultimately, Wizit made an initial $3 million investment in CHI, but did not invest the other $27 million.[28] Following the transaction, TW Devices owned 42.37% of CHI.

13. Defendants allege that during Richardson's tenure as CEO and President of CHI, he engaged in numerous unauthorized transactions that primarily benefitted himself financially.[29] Kellar claims that Richardson did not hold any shareholders meetings, or provide Kellar with any information about CHI.[30]

14. Richardson alleges that on or about August 1, 2014, Kellar, acting under his authority as President of TW Devices, signed a CHI Shareholders' Resolution on behalf of

---

[21] Compl. 11.
[22] Kellar Aff. ¶ 8.
[23] *Id.* at ¶ 9.
[24] *Id.*
[25] *Id.* at ¶ 10.
[26] Kellar Aff. ¶ 10.
[27] *Id.*
[28] *Id.*
[29] *Id.* at ¶¶ 12-26. The Court notes that Richardson denies these allegations.
[30] *Id.* at ¶ 27.

TW Devices, albeit without authorization from the TW Devices' Board, removing Richardson as Chairman of the Board and CEO of CHI.[31] Kellar also removed Richardson as TW Device's representative on the CHI board.[32] Richardson objected to Kellar's actions.[33] In November 2015, Kellar, without seeking authorization from the TW Devices Board, voted the CHI shares owned by TW Devices to appoint five (5) new members to CHI's board, including himself, but excluding Richardson.[34] Plaintiffs refer to this newly constituted CHI board as the "Illegal Board."[35] Richardson objected to Kellar's action.[36] On December 1, 2015, the CHI board notified Richardson that he was officially removed as CHI's President and CEO.[37]

15. Plaintiffs allege that the so-called "Illegal Board" "has continued to conduct business in the name of CHI to the exclusion of the [former board] and Dr. Richardson."[38] Plaintiffs further allege that "Defendants, individually and through TW Devices, have engaged in oppressive and wrongful conduct directed toward removing Dr. Richardson from meaningful participation in the activities of CHI, an entity in which he was a founding member."[39] Plaintiffs' claim the wrongful conduct includes, but is not limited to, "[t]he wasting of corporate assets of TW Devices by Defendant Kellar" and "[t]he improper voting by Defendant Kellar of CHI stock owned by TW Devices with the goal of controlling CHI and to avoid action by the legitimate CHI Board."[40]

16. Defendants contend that CHI currently lacks funds with which to continue to develop its products and that, thus far, attempts to find new investors have been

---

[31] Compl. ¶ 20.
[32] *Id.* at ¶ 28, Exhs. S.
[33] Richardson Aff. ¶ 19.
[34] Compl. ¶ 22; Kellar Aff. ¶ 28.
[35] Compl. ¶ 22.
[36] Richardson Aff. ¶ 21; Compl. ¶ 24.
[37] Kellar Aff. ¶ 28, Exh. T.
[38] Compl. ¶ 25.
[39] *Id.* at ¶ 28.
[40] *Id.*

unsuccessful. On June 3, 2016, CCF notified CHI that it was terminating its technology license with CHI effective in 90 days. Defendants allege that "[w]ithout the Technology License Agreement in place, CHI lacks critical intellectual property rights that are needed to develop its products and to continue in business. As a result, CHI has no ongoing business and, absent a new agreement with The Cleveland Clinic Foundation, no prospects for future business."[41]

17. On March 24, 2016, Plaintiffs filed the Complaint in this action. The Complaint alleges claims for breach of contract, breach of fiduciary duty, dissolution of TW Devices, and a declaratory judgment. The Complaint also requests an injunction.[42]

18. On June 17, 2016, Plaintiffs filed the Motion along with an affidavit from Richardson. On July 1, 2016, Defendants filed their Brief in Opposition to Plaintiffs Motion for Preliminary Injunction along with an affidavit from Kellar. On July 11, 2016, Plaintiffs submitted a Reply Brief in Support of their Motion for Preliminary Injunction. On July 20, 2016, the Court held a hearing on the Motion.

<u>DISCUSSION</u>

19. A preliminary injunction may be issued during litigation when "it appears by affidavit that a party thereto is doing or threatens or is about to do . . . some act . . . in violation of the rights of another party to the litigation respecting the subject of the action, and tending to render judgment ineffectual." N.C. Gen. Stat. § 1-485(2) (hereinafter, "G.S."). The movant

---

[41] Kellar Aff. ¶ 30.

[42] In the Complaint, Plaintiffs allege that they seek an injunction "prohibiting Defendants Kellar and Red Raven from voting the shares of CHI owned by TW Devices without the express written consent and approval of Dr. Richardson" (¶ 38), and "prohibiting Defendants from voting the shares of TW Devices during the pendency of this action" (prayer for relief, p. 9). In their Motion, Plaintiffs request an order "to enjoin these Defendants from voting [TW Devices]'s shared in Cleveland Heart, Inc. in violation of the Operating Agreement of [TW Devices]." At the hearing, Plaintiffs' counsel clarified that Plaintiffs are seeking an injunction preventing Defendants from voting TW Devices shares in CHI without the express approval of Richardson.

bears the burden of establishing the right to a preliminary injunction. *Pruitt v. Williams*, 288 N.C. 368, 372, 218 S.E.2d 348, 351 (1975). In order to secure preliminary injunctive relief from the Court, a movant must show "a likelihood of success on the merits of his case and . . . [that the movant] is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of his rights during the course of litigation." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 466, 579 S.E.2d 449, 452 (2003) (citations omitted); *accord Looney v. Wilson*, 97 N.C. App. 304, 307-08, 388 S.E.2d 142, 144-45 (1990). Likelihood of success means a "reasonable likelihood." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 404, 302 S.E.2d. 754, 761 (1983). In addition, the Court must balance the equities, and a preliminary injunction "should not be granted where there is a serious question as to the right of the defendant to engage in the activity and to forbid the defendant to do so, pending final determination of the matter, would cause the defendant greater damage than the plaintiff would sustain from the continuance of the activity while the litigation is pending." *Board of Provincial Elders, etc. v. Jones*, 273 N.C. 174, 182, 159 S.E.2d 545, 551-552 (1968). The issuance of an injunction is "a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities." *State v. Fayetteville St. Christian School*, 299 N.C. 351, 357, 261 S.E.2d 908, 913 (1980).

A. *Likelihood of Success.*

20.     Plaintiffs' primary claims are for breach of the Operating Agreement (breach of contract) and breach of fiduciary duty. In their briefs, the parties have argued only regarding the likelihood of success on the claim for breach of the Operating Agreement. Accordingly, the Court addresses Plaintiff's claim for breach of contract.

21.     Section 57D-2-30(e) of the North Carolina General Statutes provides that the laws of contract "govern the administration and enforcement of operating agreements." *See also N.C. State Bar v. Merrell*, 777 S.E.2d 103, 114, 2015 N.C. App. LEXIS 820, *28 (2015)

("An [LLC] operating agreement is a contract."). Accordingly, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Supplee v. Miller-Mott Bus. Coll., Inc.,* 768 S.E.2d 582, 590, 2015 N.C. App. LEXIS 49, *15 (N.C. Ct. App. 2015). The parties do not dispute that, at all relevant times, TW Devices had a valid operating agreement. Accordingly, in determining whether Plaintiffs have a reasonable likelihood of success in establishing that Defendants breached the Operating Agreement, the Court must consider: (1) the proper interpretation of the terms of the Operating Agreement and (2) whether Defendants' conduct constituted a breach of those terms.

22. Plaintiffs contend that Kellar violated the Operating Agreement by voting of TW Devices' shares in CHI because the Operating Agreement requires the consent and approval of both managers (the Board), and Kellar did not obtain that approval. Defendants contend that the Operating Agreement names Kellar the President and CEO of TW Devices and, in the absence of an express delegation of authority by the Board, vests him with the authority customarily held by corporate presidents; chiefly, the authority to manage TW Devices ordinary, day-to-day business. Defendants argue that TW Devices currently operates as a *de facto* holding company for the shares in CHI, and that voting the shares is TW Devices' only day-to-day business. The determinative question, then, is whether the Operating Agreement authorized Kellar to vote TW Devices' shares in CHI without the approval and consent of the Board.

23. The Operating Agreement vests the authority to manage TW Devices in its Board. Section 4.1(a) of the Operating Agreement gives the Board the "full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as they deem necessary or appropriate to accomplish the purposes and direct the affairs of

the Company." The Board can only act by "the affirmative vote of a majority of the Managers."[43] In addition, "without being authorized by the Board, no individual Manager shall (i) have authority to bind the Company or (ii) otherwise be entitled to sign for or take any action on behalf of the company."[44] Finally, section 4.1(c) further provides that

> Except as otherwise expressly provided in this Agreement or required by any non-waivable provision of the Act or other applicable law, no Holder or Member shall (a) have any right to vote on or consent to any matter, act, decision, or document involving the Company or its business . . . . Except to the extent expressly delegated by the Board, no member, Holder, or other Person shall be an agent for the Company or have any right, power or authority to transact any business in the name of the Company or to act for or on behalf of or to bind the Company.

24. Defendants do not contend that the Board ever delegated the authority to vote TW Devices shares in CHI to Kellar, or ever assigned specific authority or duties to the position of President or CEO.[45] Nevertheless, Section 4.12(a) of the Operating Agreement provides that in the absence of such delegation by the Board, "if the title assigned to an officer of the Company is one commonly used for officers of a business corporation formed under the North Carolina Business Corporation Act, then the assignment of such title shall constitute the delegation to such officer of the authority and duties that are customarily associated with such office." Defendants argue that Kellar was vested with "the authority and duties that are customarily associated with" the offices of president and CEO. Defendants contend that TW Devices "ordinary business, *indeed its only business*, was its ownership of shares of CHI, and the primary responsibility of [TW Devices'] President was to nominate [TW Devices'] director on CHI's board of directors."[46]

---

[43] Operating Agreement § 4.7(b).
[44] *Id.* at § 4.1(b).
[45] Indeed, Defendants conceded that "Plaintiffs are correct that Kellar could not act as a manager on behalf of [TW Devices] without Richardson's approval," but argue that Kellar was acting as an officer, and not a manager, in voting TW Devices shares in CHI. Defs.'s Br. Opp. Mot. for Prel. Injunction p. 10.
[46] *Id.* at p. 10.

25.     North Carolina law does not provide definitive guidance regarding the "customary" authority possessed by corporate presidents.  The Business Corporation Act does not define the duties or powers possessed by officers.  North Carolina's leading commentator on corporate law has noted that

> The allocation of authority and duties among corporate officers is usually outlined to some extent, either specifically or generally, by the corporate bylaws, and is then further defined in more detail by the directors and by the officers themselves. To the extent that these respective functions of corporate officers and agents are not thus defined by the corporation, they may be defined by the law and custom as developed by normal practices.

Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 16.01 (7th ed. 2015) (footnotes omitted).   Furthermore, "the president is usually designated as the principal executive officer of the corporation so that he exercises the functions of its general manager."

*Id.*

> The broadest implied authority is vested in the general manager of the corporation, since he is in charge of the ordinary conduct of its business. This authority does not extend to matters that are outside the ordinary course of business, but whether a particular matter is within the ordinary course of business is not governed by any inflexible rule. For example, a general manager ordinarily would not have implied authority to dispose of corporate real estate, but he would if the company customarily deals in realty.

*Id.* at § 16.04.

26.     The Supreme Court of North Carolina has stated that a corporate officer's position's "carries with and includes in it, as an incident, all the powers which are necessary, proper, usual and reasonable as means to effectuate the purposes for which it was created." *Brimmer v. M. H. Brimmer Co.,* 174 N.C. 435, 439, 93 S.E. 984, 985 (1917).  Moreover, "[i]n the absence of a charter or bylaw provision to the contrary, the president of the corporation is the general manager of its corporate affairs.  *Burlington Indus., Inc. v. Foil,* 284 N.C. 740, 759, 202 S.E.2d 591, 604 (1974) (internal citations omitted); *accord First Union Nat. Bank v. Brown,* 166 N.C. App. 519, 528, 603 S.E.2d 808, 815 (2004) ("The president of a corporation

is the head and general agent of the corporation and may act for it in matters that are within the corporation's ordinary course of business or incidental to it"; citations omitted) Accordingly, whether a president's conduct falls within the scope of his or her authority turns on whether such conduct involves "matters that are within the corporation's ordinary course of business." *Burlington Indus.*, 284 N.C. at 758, 202 S.E.2d at 604.

27. The record evidence regarding TW Devices ordinary business is inconsistent, at best. TW Devices' original business purpose, as stated in the Operating Agreement, was to engage in "the conception, design, production, sales and promotion of (1) pulmonary heart valve; (2) biomarker hardware and biomarkers; (3) microrobotic devices for surgical applications; (4) LVAD, RVAD and TAH; and (4) [sic] remote medical power transmission devices."[47] Currently, TW Devices' amended "Specific Company Purpose" involves "the conception, design, production, sales and promotion of the following mechanical heart assist devices; LVAD (left ventricular assist device), RVAD (right ventricular assist device) and TAH (total artificial heart)."[48]

28. Kellar, on the other hand, claims in his affidavit that TW Devices' "only business is to own shares in [CHI]."[49] Defendants cite to the

29. TW Devices was formed approximately five months before CHI existed, so TW Devices original purpose could not have been to act as a holding company for its shares in CHI. Rather, it appears that TW Devices' ownership and participation in CHI became the platform for achieving TW Devices' stated business purposes. In fact, the evidence is that CHI's purpose was the same as TW Devices – to design, manufacture, and sell the TAH, LVAD, and RVAD cardiac devices.[50]

---

[47] Operating Agreement, Article 1, Definitions, "Specific Company Purpose."
[48] TW Devices First Am. Operating Agreement ¶ 1.
[49] Kellar Aff. ¶ 6.
[50] *Id.* at ¶ 7; Richardson Aff. ¶ 12.

30. There is insufficient record evidence that TW Devices was formed and is operated solely as a holding company for the shares in CHI, thereby making the voting of the CHI shares an act incidental to the company's ordinary course of business. The stated purpose of TW Devices as provided in the Operating Agreement supports Plaintiffs' assertion that TW Devices was formed to develop cardiac devices, and not exclusively to hold shares in CHI. In addition, evidence presented by both sides establishes that Richardson and Kellar, at various times, engaged in activities as officers of CHI that advanced TW Devices stated business purpose of developing the three cardiac devices and extended beyond merely voting the shares in CHI.[51] While those activities may have been undertaken by Richardson and Kellar in their roles as officers of CHI, that does not preclude such activities from also being on behalf of TW Devices' business.

31. Defendants' cite the Delaware Chancery Court's decision in *Flaa v. Montano*, 2013 Del. Ch. LEXIS 244 (Del. Ch. 2013) as support for their contention that Kellar, as President and CEO, has the authority to vote TW Devices' shares in CHI. In *Flaa*, Daniel and Vicki Montano jointly owned a large block of stock in CardioVascular Therapeutics, Inc. ("Cardio"). *Id.* at *2. The couple formed a corporation, Vizier Investment Capital Limited ("Vizier"), in which Daniel and Vicki were 50% shareholders, "for the sole purpose of holding the [ ] shares of Cardio owned by Daniel and Vicki" in order "to insulate the couple's shared from creditors." *Id.* at *7. Vizier "had no day-to-day operations; it exist[ed] only to hold Cardio stock." *Id.* at *8. Vizier's corporate articles provided that Vizier''s President was "to manage the day to day affairs of the Company." *Id.* at *9. Daniel Montano was Vizier's President, and "historically voted the Cardio shares on behalf of Vizier," *Id.* at *27, "without

---

[51] Richardson Aff. ¶ 17; Kellar Aff. ¶¶ 8, 9, and 12. Those activities included raising capital, developing the cardiac devices, entering into licensing agreements, acquiring assets and equipment, and other activities.

objection from the other [Vizier] directors". *Id.* at *8. In addition, a regulatory filing by Vizier stated that "'Mr. Montano has sole voting and investing powers'" over Vizier's shares of Cardio." *Id.* at *8. On this evidence, the Vice Chancellor concluded that Daniel Montano, as President, had the authority to vote Vizier's shares in Cardio. *Id.* at 32.

32. The Court believes that Defendants reliance on *Flaa* is misplaced. In *Flaa*, the parties purchased the shares in Cardio and later formed Vizier "for the sole purpose" of holding the shares, and the evidence established that the only business Vizier ever engaged in was voting the shares. In addition, as the President of Vizier, Daniel Montano apparently exercised the right to vote the shares in Cardio without objection from his wife or the company's directors. In this case, as discussed above, the evidence before the Court does not support the conclusion that TW Devices was formed to act as a holding company for its shares in CHI, or that TW Devices only business activities were voting of the CHI shares. The evidence also establishes that Richardson has objected to Kellar's unilateral exercise of authority over TW Devices' shares in CHI.

33. The Court concludes that, based on the current record, Plaintiffs have established a reasonable likelihood of success on their claim for breach of the Operating Agreement.

*B. Irreparable Harm and Balancing of Equities.*

34. Plaintiffs contend that if a preliminary injunction does not issue, Richardson will be irreparably harmed by his being excluded from having any input in TW Devices' operations despite his 50% ownership interest. Defendants contend that granting the injunction would not preserve the status quo, but would upend it, since Kellar has been voting TW Devices shares in CHI. Defendants further argue that an injunction will not permit Richardson to "participate in the governance of CHI" because Richardson will not be able to

vote TW Devices' shares in CHI without Kellar's consent.[52]  Finally, Defendants contend issuance of a preliminary injunction would ensure the demise of TW Devices because Richardson will not agree to CHI being acquired by third-party.

35.     Plaintiffs' position is compelling.  The nature of the shared ownership of TW Devices, as reflected in the provisions of the Operating Agreement, strongly supports Plaintiff's contention that he is entitled to participate in the management of TW Devices, including decisions regarding how to vote its shares in CHI.  The Operating Agreement clearly establishes the parties' intent that the Board, comprised of both Richardson and Kellar, would have to approve any significant decisions involving TW Devices.  If Defendants are not enjoined, Plaintiffs will be unable to exercise their rights in TW Devices as envisioned in the Operating Agreement.  Neither the parties nor the Court can anticipate all of various issues that might require the voting of TW Devices shares in CHI, but it is a certainty that Plaintiffs will be deprived of any input regarding these issues if Defendants are not enjoined from voting the shares.[53]

36.     Defendants assert that "Richardson admits that Kellar has been voting [TW Devices'] shares of CHI" and that "the status quo warrants denying, not granting, plaintiffs' motion for preliminary injunction."[54]  Defendants ignore the fact, however, that Richardson has not acquiesced in Kellar's exercise of authority over the shares, but instead has objected to it.[55]  In addition, the Court's authority is not limited to preserving the "status quo," but

---

[52] Defs.'s Br. Opp. Mot. for Prel. Injunction pp. 7-8.
[53] Defendants contend some of the "the transactions requiring approval by a supermajority of CHI's shareholders are CHI's only hope for staying in existence," including "(i) merging the business operations of the Company with another business, (ii) licensing technology; (iii) borrowing funds; or (iv) entering a transaction with a shareholder." *Id.* at p. 9.
[54] *Id.*
[55] Richardson Aff.  ¶¶ 19, 21; Compl. ¶¶ 21, 24.

extends to enjoining a party from doing acts "in violation of the rights of another party." G.S. § 1-485(2).

37. Defendants' contention that a preliminary injunction will not allow Richardson to unilaterally vote TW Devices' shares in CHI or otherwise participate in CHI's "governance" are equally unavailing. Plaintiffs do not seek to wrest the right to vote the shares from Kellar and for themselves. Rather, they request only that Defendants be prohibited from voting the shares without the approval of the TW Devices Board during the pendency of this action. As Plaintiffs note, "[t]hough the preliminary injunction . . . would not restore Dr. Richardson to his position as Chair and CEO of CHI, . . . it would require Mr. Kellar to consult and engage Dr. Richardson regarding issues for which [TW Devices'] shares in CHI must be voted, and vice versa."[56] To the extent CHI seeks shareholder approval for certain actions, an order requiring Defendants to seek approval from the TW Devices Board to vote the shares in CHI shares will, in fact, allow Richardson to participate in CHI's governance.

38. Finally, Defendants' argument that issuance of a preliminary injunction will ensure the demise of TW Devices is speculative. Defendants contend that CHI's best chance of a continued existence is some kind of acquisition of CHI by a third party. Defendants implicitly suggest that Richardson will not agree to vote TW Devices shares in favor of any acquisition.[57] The Court rejects the notion that Kellar should be permitted to vote the shares in CHI with Richardson's input on the unsupported grounds that Richardson would intentionally frustrate any opportunity that might be beneficial to the business. Such a proposition defies both well-established principles of law and basic logic. Not only would

---

[56] Pls.' Reply Supp. of Mot. for Prel. Injunction. P. 8.
[57] At the hearing, Defendants conceded that pursuant to section 4.12(a)(v) of the Operating Agreement Kellar would not be able to vote TW Devices' shares in favor of a proposal that required the sale of TW Devices shares to another party without the approval of the TW Devices Board and, hence, Richardson. Nevertheless, both parties admitted that they could not rule out other potential proposals for a change in control of CHI that would not involve the sale of TW Devices shares.

Richardson have a fiduciary responsibility to consent to a transaction that was in the best interest of TW Devices,[58] he would also be personally incented to do so by virtue of his substantial monetary interest in TW Devices.[59] Accordingly, the Court finds unpersuasive the argument that enjoining Kellar from voting TW Devices' CHI shares without Richardson's consent will necessarily ensure the demise of CHI.

39. Accordingly, Plaintiffs have established that they will suffer irreparable harm if the requested order is not issued, and the Court concludes in its discretion that Plaintiffs' Motion for Preliminary Injunction should be GRANTED.

THEREFORE, IT IS ORDERED that:

40. Plaintiffs' Motion for Preliminary Injunction is GRANTED.

41. Franz Kellar and Red Raven, LLC are IMMEDIATELY ENJOINED and PROHIBITED, directly or indirectly, alone or in concert with others, from voting TransWorld Medical Devices, LLC's shares in Cleveland Heart, Inc. without the express written consent and approval of the TW Devices Board, including Dr. Richardson.

42. On or before 5:00 p.m. on Friday, August 5, 2016, Plaintiffs shall post security for the issuance of this Order in the amount of $ 250.00, as required by Rule 65(c), in form satisfactory to the Clerk of Superior Court of Gaston County.

43. Except as specifically granted herein, Plaintiffs' Motion for Preliminary Injunction is DENIED.

---

[58] N.C. Gen. Stat. § 57D-3-21 ("Each manager shall discharge that person's duties (i) in good faith . . . and (iii) subject to the operating agreement, in a manner the manager believes to be in the best interests of the LLC.").

[59] The Court also notes that Richardson recently claimed to have a potential buyer for CHI. Kellar Aff. ¶ 38, Exh. V. While Defendants expressed skepticism as the buyer's ability to consummate such a purchase, it does not appear to the Court that Richardson is opposed to any potential sale of CHI or TW Devices shares in CHI.

SO ORDERED, this the 2nd  day of August, 2016.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases