Richardson v. Kellar, 2017 NCBC 108.

STATE OF NORTH CAROLINA

GASTON COUNTY

DR. CHARLES RICHARDSON and
TRANSWORLD MED, LLC,

                Plaintiffs,

v.

FRANZ KELLAR; RED RAVEN,
LLC; and TRANSWORLD MEDICAL
DEVICES, LLC,

                Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 1126

**ORDER AND OPINION ON
DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

1. For a decade, Plaintiff Dr. Charles Richardson and Defendant Franz Kellar have been involved in efforts, long since stalled, to bring certain artificial heart technology to market through their jointly owned company, TransWorld Medical Devices, LLC ("TW Devices"). This litigation arises from disputes between Richardson and Kellar regarding the management of TW Devices. Defendants have moved for partial summary judgment as to Plaintiffs' claims for breach of TW Devices' Operating Agreement and for a declaratory judgment. For the reasons stated below, the Court **GRANTS in part** and **DENIES in part** the motion.

> *Nexsen Pruet, PLLC, by Kathleen D.B. Burchette and Paul A. Dominick, for Plaintiffs.*
>
> *Robinson, Bradshaw & Hinson, P.A., by Thomas P. Holderness, for Defendants.*

Conrad, Judge.

# I.
# BACKGROUND

2.     The Court does not make findings of fact in ruling on motions for summary judgment.  The following background, drawn from the evidence submitted in support of and opposition to Defendants' motion, is intended to provide context for the Court's analysis and ruling.

3.     In July 2007, Richardson and Kellar formed TW Devices.  (V. Compl. ¶ 9.) TW Devices has two members: Plaintiff Transworld Med, LLC (Richardson's personal entity) and Defendant Red Raven, LLC (Kellar's personal entity).  (V. Compl. ¶¶ 2, 4, 7, 8.)  Transworld Med and Red Raven each own a 50 percent interest in TW Devices. (Third Aff. Holderness, Ex. 9 at Plfs_000277 ["Op. Agrmt."], ECF No. 61.2.)

4.     TW Devices' Operating Agreement, effective September 30, 2007, details the rights and obligations of the company's members and managers.  (*See* Op. Agrmt. § 4.1(a).)  "Except as otherwise expressly provided," the Operating Agreement vests "full, exclusive and complete discretion to manage and control the business and affairs of the Company" in a Board of Managers ("Board").  (Op. Agrmt. § 4.1(a).)  The Board consists of two managers, neither of whom holds individual "authority to bind the Company" or to "take any action on behalf of the Company" without the authorization of the Board as a whole.  (Op. Agrmt. § 4.1(b).)

5.     The Operating Agreement also provides for the appointment of officers.  (*See* Op. Agrmt. § 4.12(a)–(b).)  The officers may exercise "only such authority and perform such duties as the Board . . . expressly delegate[s] to them."  (Op. Agrmt. § 4.12(a).) In the event an officer is assigned a title "commonly used for officers" of North

Carolina corporations, the assignment "shall constitute the delegation to such officer of the authority and duties that are customarily associated with such office." (Op. Agrmt. § 4.12(a).) This authority, in turn, is expressly limited by a list of thirteen significant, enumerated actions that require Board approval (such as the sale of property worth more than $50,000). (*See* Op. Agrmt. § 4.12(a)(i)–(xiii).)

6. Richardson and Kellar, through their respective entities, appointed themselves to serve as the company's managers and members of the Board. (Op. Agrmt. §§ 4.1(b), 4.2, 4.3(a); *see also* Op. Agrmt. at Plfs_000274.) The Operating Agreement named Richardson as Chairman of the Board and Kellar as President and Chief Executive Officer. (Op. Agrmt. §§ 4.5, 4.12(b).)

7. In December 2007, TW Devices, the Cleveland Clinic Foundation, and several smaller investors formed Cleveland Heart, Inc. (*See* Third Aff. Holderness Ex. B ["Richardson Dep."] at 35:23–36:23, ECF No. 63; Aff. Marshall ¶ 6, ECF No. 65; *see also* Aff. Richardson ¶¶ 12–13, ECF No. 18.1.) The purpose of Cleveland Heart was to develop "devices for patients suffering from irreversible end-stage heart failure." (Aff. Kellar ¶ 7, ECF No. 24; *see also* Aff. Richardson ¶ 12 ("established to develop cardiac circulatory assist devices").) Cleveland Heart's primary asset was a technology license from the Clinic and TW Devices. (*See* Richardson Dep. 91:12–23; Aff. Kellar Exs. A at ¶ 4(b), D at 2, U, ECF No. 25; Aff. Kellar ¶ 30.)

8. According to Kellar, by 2012, Cleveland Heart "ha[d] met several milestones in the development of its products but needed additional cash." (Aff. Kellar ¶ 9.) In July 2012, Cleveland Heart agreed to sell $30 million of new stock to Wizit Power

Heart Health Consortium, Inc. ("Wizit"). (Third Aff. Holderness Exs. 30, 33, ECF No. 61.1.) As a condition of purchasing the stock, Wizit requested that Cleveland Heart appoint Richardson to be its CEO, President, and Chairman of the Board. (Aff. Kellar ¶ 10; Third Aff. Holderness Ex. 33 at 15, § 7.1(c).) Wizit also received two seats on Cleveland Heart's board, displacing Kellar and another incumbent director. (*Compare* Third Aff. Holderness Ex. 30 at § 7.1(b)–(d), *with* Third Aff. Holderness Ex. 24 at § 7.1(b)–(c), ECF No. 61.1.) After the sale to Wizit, TW Devices held a 42.37% stake in Cleveland Heart. (Aff. Kellar, Ex. L at 3, ECF No. 25; Aff. Richardson ¶ 12.)

9.      Around this time, Cleveland Heart's product development stalled. (*See* Aff. Kellar ¶¶ 12, 29–30.) Wizit delivered only $3 million of its promised investment. (Second Aff. Kellar ¶ 7, ECF No. 64; *see also* Third Aff. Holderness Ex. 30.) Exacerbating matters, according to Kellar, Richardson became increasingly unresponsive as an officer and director of Cleveland Heart, holding no shareholder meetings and ignoring Kellar's requests for information. (*See* Aff. Kellar ¶¶ 13, 27; Third Aff. Holderness Exs. 88, 89, ECF No. 62.)

10.      During 2013, Kellar began to explore whether he "was authorized to act on behalf of [TW Devices] with respect to matters related to" Cleveland Heart. (Aff. Marshall ¶ 8; *see also* Second Aff. Dominick Ex. A ["Kellar Dep."] at 33:8–10, ECF No. 78.) Kellar states that he reviewed the Operating Agreement and consulted with Harrison Marshall, the attorney who drafted the Operating Agreement. (*See* Second Aff. Kellar ¶ 12; Aff. Marshall ¶¶ 6, 8.)

11. According to his affidavit, Marshall advised that Kellar could take unilateral action. In his capacity as a manager, Kellar's hands were tied, but his authority as President was "coextensive with the authority of a president of a North Carolina corporation" to act in the company's "ordinary course of business." (Aff. Marshall ¶ 7, Ex. B at 2, ECF No. 65.) Taking the view that TW Devices' "only course of business" is "to manage its interest in Cleveland Heart," (Aff. Marshall Ex. B at 2), Marshall concluded that the Operating Agreement provides Kellar with "sufficient authority" to designate TW Devices' Cleveland Heart board member and to vote its Cleveland Heart stock. (Aff. Marshall ¶ 8.)

12. In 2014 and 2015, Kellar began taking actions as TW Devices' President and CEO and without the consent of its Board. Kellar removed Richardson as TW Devices' representative on Cleveland Heart's board and designated himself as Richardson's replacement. (*See* Third Aff. Holderness Ex. 54, ECF No. 62; Aff. Kellar ¶ 28.) He later voted TW Devices' Cleveland Heart shares in support of resolutions to increase the size of the Cleveland Heart board from five to seven and to appoint new board members. (*See* Third Aff. Holderness Ex. 121 at 2, Ex. A; Aff. Kellar ¶ 28.) Cleveland Heart's new board officially notified Richardson of his removal as president and CEO on December 1, 2015. (*See* Aff. Kellar Ex. T, ECF No. 25; Third Aff. Holderness Ex. 91, ECF No. 62.1.)

13. Richardson objected to Kellar's unilateral actions. (Aff. Richardson ¶ 19; Second Aff. Richardson Ex. D, ECF No. 80.5.) Until this time, TW Devices had voted its Cleveland Heart shares only upon agreement by Richardson and Kellar. (Second

Aff. Richardson ¶ 6, ECF No. 80; Richardson Dep. 62:3–25; Kellar Dep. at 33:11–18.) According to Richardson, Kellar lacked authority to act on behalf of TW Devices, and the actions to remove him as an officer and director of Cleveland Heart and to restructure Cleveland Heart's board were invalid as a result. (*See* Third Aff. Holderness Ex. 33 at § 7.4(f); Third Aff. Holderness Ex. 121 at 3.)

14. Richardson filed this suit on March 24, 2016. His complaint asserts causes of action for breach of contract, breach of fiduciary duty, dissolution of TW Devices, and declaratory judgment.

15. On June 17, 2016, Richardson moved for a preliminary injunction. (ECF No. 14.) In that motion, Richardson sought to prevent Kellar from voting, without Richardson's consent, the shares of Cleveland Heart owned by TW Devices. The Honorable Gregory P. McGuire granted the motion on August 2, 2016. (Order on Mot. for Prelim. Inj. ["PI Order"], ECF No. 27.)

16. Defendants moved for summary judgment on June 9, 2017. (Mot. for Part. Summ. J. ["Mot."], ECF No. 56.) The motion is fully briefed, and the Court held a hearing on September 7, 2017, at which all parties were represented by counsel. The motion is ripe for determination.

## II.
## DISCUSSION

17. Defendants seek summary judgment on Plaintiffs' claims for breach of contract, stated against Kellar and Red Raven, and declaratory judgment, stated against all Defendants. (*See* Mot. 1–2.) Although Defendants also moved for

summary judgment on Plaintiffs' claim for breach of fiduciary duty, Plaintiffs have since dismissed that claim with prejudice. (*See* ECF No. 82.)

A. Legal Standard

18. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). In deciding a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmov[ant]," taking the non-movant's evidence as true and drawing inferences in its favor. *Furr v. K-Mart Corp.*, 142 N.C. App. 325, 327, 543 S.E.2d 166, 168 (2001).

19. The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002). If the moving party carries this burden, the responding party "may not rest upon the mere allegations or denials of his pleadings," *Khashman v. Khashman*, 2017 N.C. App. LEXIS 715, at *15 (Sept. 5, 2017) (unpublished), but must instead "come forward with specific facts establishing the presence of a genuine factual dispute for trial," *Liberty Mut. Ins. Co.*, 356 N.C. at 579, 573 S.E.2d at 124. A "genuine issue" exists when "'it is supported by substantial evidence,' which is that amount of relevant evidence necessary to persuade a reasonable mind to accept a conclusion." *Id.* at 579, 573 S.E.2d at 124 (quoting *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002)) (internal citation omitted).

## B. Breach of Contract

20. A party establishes that a breach of contract has occurred when (1) a valid contract exists and (2) a term of the contract is breached. *See Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Here, the relevant contract is TW Devices' Operating Agreement. *See N.C. State Bar v. Merrell*, 777 S.E.2d 103, 114 (N.C. Ct. App. 2015) ("An [LLC] operating agreement is a contract."). It is undisputed that the Operating Agreement is a valid contract, but the parties dispute whether any term was breached.

21. The parties' briefing largely reprises the arguments made in support of and in opposition to Plaintiffs' motion for preliminary injunction. Plaintiffs contend that Defendants breached the Operating Agreement by unilaterally voting TW Devices' shares of Cleveland Heart. (*See* Pls.' Response in Opp'n to Defs.' Mot. ["Opp'n"] 8, ECF No. 72.) Defendants respond that Kellar, in his capacity as TW Devices' President, was authorized to vote the shares. (*See* Br. in Supp. of Defs.' Mot. ["Br."] 9–12, ECF No. 58.)

22. At the hearing, Defendants raised two new arguments: first, that Kellar is not a party to the Operating Agreement and, second, that any breach by Kellar does not also constitute a breach by Red Raven. With the Court's permission, Plaintiffs filed a supplemental brief. (ECF Nos. 92, 93.) The Court addresses these threshold arguments first.

1.  Arguments Raised at the Hearing

23.    Defendants contend that Kellar is not a party to the Operating Agreement. If so, Kellar would be entitled to summary judgment.  When a defendant is "not a party to the contract," then "as a matter of law he cannot be held liable for any breach that may have occurred."  *Canady v. Mann*, 107 N.C. App. 252, 259, 419 S.E.2d 597, 601 (1992).

24.    According to section 4.2 of the Operating Agreement, however, "any Manager" who "is not a Member . . . must execute a copy of this Agreement agreeing to become bound by the provisions hereof."  Kellar, who is not a member of TW Devices, signed the Operating Agreement in his capacity as a manager.  (*See* Op. Agrmt. at Plfs_000272, Plfs_000276; *see also* Pls.' Suppl. Br. 2, ECF No. 93.)  Kellar therefore appears to be "bound by the provisions" of the Operating Agreement, as required by section 4.2.  At a minimum, a jury could reasonably reach that conclusion. Therefore, Kellar is not entitled to summary judgment on this ground.

25.    Defendants also argue that there is no evidence of a breach by Red Raven. The Court agrees.  Plaintiffs' claim for breach of contract is based solely on Kellar's actions in voting the Cleveland Heart shares.  The undisputed evidence shows that Kellar purported to vote the shares in his capacity as President or CEO of TW Devices and not on behalf of Red Raven. (*See* Third Aff. Holderness Ex. 121 at 4, Ex. C; Third Aff. Holderness Ex. 130 at CCF000414; *see also* Second Aff. Kellar ¶¶ 12, 14; Aff. Marshall ¶ 8.)  Viewing the evidence in a light most favorable to Plaintiffs, there is no genuine issue of material fact as to whether Red Raven breached the Operating

Agreement. The Court therefore grants summary judgment in favor of Red Raven on the claim for breach of contract.

2. Kellar's Authority Under the Operating Agreement

26. The next issue concerns Kellar's argument that he did not breach the Operating Agreement because he "had the authority to vote" TW Devices' shares in Cleveland Heart in his capacity as "President and Chief Executive Officer." (Br. 10.) The parties agree that, under section 4.12(a) of the Operating Agreement, TW Devices' officers have "the authority and duties that are customarily associated with such office." In North Carolina, a corporation's president has the customary authority to "act for it in matters that are within the corporation's ordinary course of business or incidental to it." *First Union Nat'l Bank v. Brown*, 166 N.C. App. 519, 528, 603 S.E.2d 808, 815 (2004) (citation and quotation marks omitted). Accordingly, the relevant question is whether voting the Cleveland Heart shares is within TW Devices' "ordinary course of business or incidental to it." *Id.*

27. Kellar contends that it is. In his view, TW Devices' "only business" is to serve as a holding company for the Cleveland Heart shares, such that voting the shares is incidental to the company's ordinary business. (Br. 11 (emphasis omitted).) In support, Kellar offers evidence suggesting that the parties formed TW Devices for the purpose of creating Cleveland Heart. (*See* Richardson Dep. 35:23–36:23; Second Aff. Kellar ¶ 4; Aff. Marshall ¶ 6.)

28. Plaintiffs respond that "TW Devices' ordinary business clearly does not include unilaterally voting TW Devices' interest in a related company or altering an

affiliated company's governance." (Opp'n 10–11.) They point to evidence showing that TW Devices' business purpose related to the development of artificial heart technology, not simply to serve as a holding company for a minority interest in Cleveland Heart. (*See* Op. Agrmt. at Plfs_000273 ¶ 1.) Plaintiffs further contend that Defendants' argument conflicts with TW Devices' "organizational construct," which places "full, exclusive, and complete" authority in the company's managers while expressly restricting the authority of its officers. (Opp'n 11–12 (citing Op. Agrmt. §§ 4.1, 4.7).)

29. These arguments echo the preliminary-injunction briefing, and all were thoroughly addressed by Judge McGuire in the order granting Plaintiffs' motion for preliminary injunction. Judge McGuire found the evidence that TW Devices "was formed and is operated solely as a holding company" to be "insufficient" and "inconsistent." (PI Order 12–15.) He concluded that Plaintiffs had succeeded in establishing "a reasonable likelihood of success on their claim for breach of the Operating Agreement." (PI Order 14.)

30. Judge McGuire's ruling, while not binding on the Court at this stage of the proceeding, is nonetheless highly relevant. In opposing summary judgment, Plaintiffs need not demonstrate a likelihood of success. They need only offer "more than a scintilla of evidence" that Kellar was not authorized to vote the shares. *DeWitt*, 355 N.C. at 681, 565 S.E.2d at 146. The evidence presented by Plaintiffs, which was also presented to and considered by Judge McGuire, meets that minimal threshold.

31. Among other things, the Operating Agreement includes a statement of purpose identifying TW Devices' business as "the conception, design, production, sales and promotion of [certain] mechanical heart assist devices." (Op. Agrmt. at Plfs_000273 ¶ 1.) Some evidence also suggests that TW Devices, which was formed before Cleveland Heart, holds intellectual property assets and has had other business activities apart from holding the Cleveland Heart shares. (Third Aff. Holderness Exs. 24 at 2, 33 at 2; Richardson Dep. 91:12–23; Aff. Kellar Ex. A at ¶¶ 1(c), 4(b); Aff. Kellar Ex. U.) In addition, prior to Kellar's unilateral actions, Richardson and Kellar had a history of voting the shares by consent. (Second Aff. Richardson ¶ 6; Richardson Dep. 62:3–25; Kellar Dep. 33:11–18.) From this evidence, a jury could reasonably conclude that TW Devices was not formed merely to hold shares in Cleveland Heart and that voting those shares is not incidental to the company's ordinary course of business.

32. To the extent Kellar has introduced new evidence that was not part of the preliminary-injunction record, it deepens the parties' factual dispute but does not warrant summary judgment. For example, Kellar contends that Richardson, in his deposition, "admitted that [TW Devices] did business only through" Cleveland Heart. (Br. 1 n.2; *see also* Br. 11; Richardson Dep., 36:23–37:7, 93:8–13.) But as Judge McGuire cogently explained, the fact that "activities may have been undertaken by Richardson and Kellar in their roles as officers of" Cleveland Heart "does not preclude such activities from also being on behalf of TW Devices' business." (PI Order 13.)

33.  At bottom, this dispute presents a jury question. The Operating Agreement does not expressly delegate authority to Kellar to vote the Cleveland Heart shares without Board approval. Plaintiffs have offered sufficient evidence to create a genuine issue of material fact as to whether doing so was incidental to TW Devices' ordinary business and, therefore, whether Kellar was implicitly authorized to vote the shares in his capacity as President. Kellar is not entitled to summary judgment on this basis.

### 3. Kellar's Additional Arguments

34.  Kellar makes three additional arguments that summary judgment is appropriate even if he was not authorized to unilaterally vote the Cleveland Heart shares as TW Devices' President.

35.  First, Kellar contends that no provision in the "Operating Agreement affirmatively *prohibit[s]* Kellar as an officer from voting the shares." (Br. 12.) Thus, in Kellar's view, even assuming he acted outside the scope of his authority as an officer, his actions would be void or voidable but would not be a breach of the Operating Agreement. (Br. 12–13.) The Court disagrees. Kellar's alleged overreach, if proven, impinged on the Board's "full, exclusive, and complete" authority to control the business of the Company. (*See* Op. Agrmt. § 4.1(a).) A jury could reasonably conclude that Kellar, acting outside his authority as an officer, breached the provisions requiring joint governance by the company's managers. (*See* Br. 10 (acknowledging that the "Operating Agreement prohibits a *manager* from taking any action on behalf of [TW Devices] without the approval of the other manager").)

36. Next, Kellar argues that section 4.13(b) of the Operating Agreement shields him from liability. Section 4.13(b) "fully protect[s]" a manager who "rel[ies] in good faith upon" information or opinions "presented to the Company" by a professional in his professional capacity. Kellar contends he acted in reliance on the advice of Marshall, the attorney who drafted the Operating Agreement and served as TW Devices' counsel. Plaintiffs observe that Marshall has also represented Kellar personally (*see* Opp'n 19), and Marshall's affidavit does not say in what capacity he advised Kellar, (Aff. Marshall ¶¶ 6–7; *see also* Aff. Marshall Ex. A ("our firm is counsel to Red Raven LLC")). As a result, there is a question of fact regarding whether Marshall "presented" the relevant advice "to the Company," as required by section 4.13(b). (Op. Agrmt. § 4.13(b); *see also* Second Aff. Richardson ¶ 7.)

37. Finally, Kellar cites N.C. Gen. Stat. § 57D-2-32(b), which states that a "person who is a party to or bound by" an LLC's operating agreement cannot be "liable to . . . another person who is a party to the operating agreement" based on actions taken in "reliance on the provisions of the operating agreement." Although the parties dispute whether section 57D-2-32(b) requires reasonable or good-faith reliance, or only actual reliance (*see* Reply 8, ECF No. 83), the Court need not reach that question because this statute applies only "[u]nless otherwise provided in the operating agreement." N.C. Gen. Stat. § 57D-2-32(b). Here, the Operating Agreement includes detailed provisions regarding limitations of liability for managers and officers. (*See* Op. Agrmt. § 4.13(a)–(b).) Accordingly, Kellar must rely, if at all, on the terms provided in the Operating Agreement.

38. Plaintiffs' declaratory-judgment claim requests three declarations: that Richardson has authority to vote the Cleveland Heart stock, that Defendants do not have the authority to vote the stock, and that any prior votes of the stock, made without Richardson's approval and consent, are null and void. (*See* V. Compl. ¶¶ 32–34.) As Defendants point out, Richardson testified at his deposition that any vote of the Cleveland Heart stock required a "meeting of the minds" between Richardson and Kellar. (Br. 20 (citing Richardson Dep. at 62); *see also* Second Aff. Richardson ¶ 5 ("[N]either Defendant [Kellar] nor me had the right to vote the CHI shares owned by TW Devices without being in agreement on the vote.").) Accordingly, the undisputed evidence shows that Richardson does not possess unilateral authority to vote the Cleveland Heart stock, and he is not entitled to a declaration to that effect.

39. Plaintiffs' remaining requests for declaratory relief depend on whether Kellar was authorized to vote the shares in his capacity as President. Having concluded that this factual dispute presents a jury question as to the claim for breach of contract, the Court also denies Kellar's motion for summary judgment as to the declaratory-judgment claim for the same reasons.

## III.
## CONCLUSION

40. For these reasons, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' claim for breach of contract against Red Raven and as to Plaintiffs' claim for a declaration that Richardson holds unilateral authority to vote

TW Devices' Cleveland Heart shares. In all other respects, Defendants' motion is **DENIED**.

This the 27th day of November, 2017.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
for Complex Business Cases