Agarwal v. Est. of Anil Agarwal, 2022 NCBC 7.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

ASHISH AGARWAL,

        Plaintiff,

    v.

ESTATE OF ANIL AGARWAL,
Deceased; WENDOVER DONUTS,
LLC; KUSH DONUTS, LLC; and
SARASH PROPERTIES, LLC,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 5263

**ORDER AND OPINION ON
DEFENDANT'S MOTION FOR
JUDGMENT ON THE PLEADINGS**

1. THIS MATTER is before the Court on Defendant Estate of Anil Agarwal's Motion for Judgment on the Pleadings (the "Motion") pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure (the "Rule(s)"). (ECF No. 35.) The Motion, which requests partial relief, focuses on the language of identical provisions in the operating agreements of three closely-held North Carolina limited liability companies. At issue is whether the language of the operating agreements requires the dissolution of the LLCs following the death of one of their members.

2. Having considered the Motion, the related briefing, appropriate matters of record, and the arguments of counsel at a hearing on the Motion, the matter is ripe for determination.

3. For the reasons set forth below, the Motion is **GRANTED** in part and **DENIED** in part.

*West Law Firm, by William E. West, Jr., for Plaintiff Ashish Agarwal.*

*Carruthers & Roth, P.A., by Kevin A. Rust, for Defendant-Estate of Anil Agarwal.*

*Defendants Wendover Donuts, LLC; Kush Donuts, LLC; and Sarash Properties, LLC are currently unrepresented.*

Earp, Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

4. The Court does not find facts on motions for judgment on the pleadings under Rule 12(c) but rather recites the facts alleged in the pleadings that are relevant to the Court's determination of the Motion. *Willard v. Barger*, 2019 NCBC LEXIS 43, at *1–2 (N.C. Super. Ct. July 12, 2019) (citing *Erickson v. Starling*, 235 N.C. 635, 657 (1952)).

5. The events giving rise to this litigation began when Dr. Anil Agarwal ("Dr. Agarwal") acquired three Dunkin' Donuts franchises in North Carolina. (Am. Compl. ¶ 6, ECF No. 18.) Between April 2014 and April 2015, Dr. Agarwal formed both Wendover Donuts, LLC and Kush Donuts, LLC to own and operate the franchises. (Am. Compl. ¶ 7.) Dr. Agarwal also formed Sarash Properties, LLC (together, with Wendover Donuts, LLC and Kush Donuts, LLC, the "LLCs") to own and manage the real property for at least one of the franchises. (Am. Compl. ¶ 7.)

6. At the time the LLCs were organized, Dr. Agarwal was the sole member. (Am. Compl. ¶ 9.) However, Dr. Agarwal did not have experience managing Dunkin' Donuts franchises, so he contacted Plaintiff Ashish Agarwal ("Plaintiff"), who was formerly related to him by marriage, for assistance. (Am. Compl. ¶ 9; Answer, Cross-

cl., & Derivative Countercl. ¶ 5, ECF No. 31.) Plaintiff was a successful owner and operator of Dunkin' Donuts franchises in New York. (Am. Compl. ¶ 9.) At Dr. Agarwal's invitation, Plaintiff agreed to relocate to North Carolina and manage the LLCs, "provided that he would have membership interests in the [LLCs] equal to that of [Dr. Agarwal]." (Am. Compl. ¶ 9.) In return, Dr. Agarwal agreed that Plaintiff "would receive a fifty percent membership interest in each of the companies, as well as a fifty percent interest in Decedent's capital accounts in each of the [c]ompanies and in any other assets of the companies." (Am. Compl. ¶ 9.)

7. On 28 July 2015, Dr. Agarwal and Plaintiff entered into an operating agreement for Sarash Properties, LLC, specifying that Dr. Agarwal and Plaintiff each had a 50% interest in this LLC. (Am. Compl. ¶ 10; Ex. D, ECF No. 43.)

8. Thereafter, on 3 November 2015, Dr. Agarwal and Plaintiff entered into two more operating agreements: one for Wendover Donuts, LLC, and a second one for Kush Donuts, LLC. (Am. Compl. ¶¶ 11, 12.) The operating agreement for Wendover Donuts, LLC provided that Dr. Agarwal owned 50%, Plaintiff owned 45%, and a third person, who later withdrew as a member, owned the remaining 5%. (Am. Compl. ¶ 11; Ex. E, ECF No. 24.) Dr. Agarwal and Plaintiff were equal members of Kush Donuts, LLC. (Am. Compl. ¶ 12; Ex. F, ECF No. 25.)

9. On 29 December 2015, Dr. Agarwal and Plaintiff entered into a written agreement ("29 December Agreement") providing that "fifty percent of the membership interests in Kush Donuts, LLC, and fifty percent of the membership

interests in Wendover Donuts, LLC were transferred to Plaintiff." (Am. Compl. ¶ 13; Ex. G, ECF No. 26.)

10.    The operating agreements contain a mandatory dissolution provision that is triggered upon the death of a member, unless within ninety days following the death, the members "mutually agree" in writing otherwise.  (Ex. D, ECF No. 43; Ex. E, ECF No. 24; Ex. F, ECF No. 25; collectively the "Operating Agreements", § 10.1.)

11.    Dr. Agarwal died on 15 December 2020.  (Am. Compl. ¶ 14.)

12.    Three months after his death, Plaintiff, acting alone, executed three corporate resolutions, one for each LLC, electing not to dissolve the LLCs but to continue their operations.  (Am. Compl. ¶ 15.)

13.    The effect of these resolutions, however, is in dispute.  Plaintiff and Dr. Agarwal's estate ("the Estate") disagree as to whether the relevant language in the Operating Agreements affords Plaintiff the unilateral ability to decide the fate of the three LLCs.  (Am. Compl. ¶ 16.)[1]

14.    Consequently, Plaintiff filed suit on 12 May 2021, (Compl., ECF No. 3), and amended his complaint on 13 September 2021, (Am. Compl., ECF No. 18), seeking, among other things, a declaratory judgment "with regard to the application, interpretation, and meaning of the operating agreements . . . and whether the death of [Dr. Agarwal] requires that the companies be dissolved, and their affairs wound up." (Am. Compl. ¶ 20.)

---

[1] (*See* Exs. D, E, F.)  For purposes of this Motion, the relevant language of the three operating agreements is the same.  Therefore, the analysis is the same for each of the LLCs.

15.     The Estate responded with a cross-claim against the LLCs requesting a declaration that they be dissolved in accordance with the terms of the Operating Agreements, as well as pursuant to N.C.G.S. § 57D-6-02(2).  (Answer, Cross-cl., & Derivative Countercl. ¶ 26.)  It also counterclaimed on behalf of Kush Donuts, LLC and Wendover Donuts, LLC against Plaintiff, as manager of the LLCs, for alleged breach of his fiduciary duties.  (Answer, Cross-cl., & Derivative Countercl. ¶ 2.)

16.     On 11 November 2021, the Estate moved for judgment on the pleadings pursuant to Rule 12(c) requesting that the Court enter a partial judgment in its favor. (Mot. J. Pleadings, ECF No. 35.)  Specifically, the Estate seeks a declaration from the Court that, in accordance with the plain language of the Operating Agreements: (1) the death of Dr. Agarwal is a mandatory dissolution event pursuant to Section 10.1, and (2) upon the death of Dr. Agarwal, the Estate became a member of each of the LLCs and was entitled to vote on Plaintiff's resolutions to continue their operations. Plaintiff responds that: (1) Section 10.1 is, at best, ambiguous, and questions of fact prevent a determination at this stage regarding whether the LLCs must dissolve, and (2) the Operating Agreements do not establish that the Estate is a member of the LLCs entitled to vote on whether operations continue.

17.     After full briefing, the Court held a hearing on 16 December 2021 (the "Hearing"), at which counsel for Plaintiff and counsel for the Estate were heard.[2]  The Motion is now ripe for determination.

---

[2] No counsel for the LLCs has appeared in this case.

## II.    LEGAL STANDARD

18.    A motion for judgment on the pleadings "is appropriately employed where all the material allegations of fact are admitted in the pleadings and only questions of law remain." *Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, 376 N.C. 63, 70 (2020) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 137 (1974) (internal quotation marks omitted)).  Furthermore,

> [a]s with a motion to dismiss, the trial court is required to view the facts and permissible inferences in the light most favorable to the nonmoving party.  A Rule 12(c) movant must show that the complaint fails to allege facts sufficient to state a cause of action or admits facts which constitute a complete legal bar to a cause of action.

*Tully v. City of Wilmington*, 370 N.C. 527, 532 (2018) (cleaned up).

19.    When analyzing a Rule 12(c) motion, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Weaver v. Saint Joseph of the Pines, Inc.,* 187 N.C. App. 198, 204 (2007) (citation and internal quotation marks omitted).  Moreover, when a document is attached, "[t]he terms of such exhibit control other allegations of the pleading attempting to paraphrase or construe the exhibit, insofar as these are inconsistent with its terms." *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 206 (1970).

20.    Ultimately, "[t]he party moving for judgment on the pleadings must show that no material issue of fact exists and that he is entitled to judgment as a matter of law." *Daniels v. Montgomery Mut. Ins. Co.*, 320 N.C. 669, 682 (1987) (citation omitted).

## III.     ANALYSIS

21.     The parties assert competing claims for declaratory judgment based on their interpretations of the Operating Agreements.  The Declaratory Judgment Act, N.C.G.S. § 1-253, *et seq.*, "affords an appropriate procedure for alleviating the uncertainty in the interpretation of written instruments and for clarifying litigation." *Woodcock v. Cumberland Cnty. Hosp. Syst.*, 2022 NCBC LEXIS 3, at *6–7 (N.C. Super. Ct. Jan. 20, 2022) (quoting *Hejl v. Hood, Hargett & Assocs.*, 196 N.C. App. 299, 302 (2009) (internal quotations omitted)).

22.     An LLC is "primarily a creature of contract[,]" *Battles v. Bywater, LLC,* 2014 NCBC LEXIS 54, at *8 (N.C. Super. Ct. Oct. 31, 2014) (cleaned up), and operating agreements are contracts, *N.C. State Bar v. Merrell*, 243 N.C. App. 356, 370 (2015).  Thus, the Court construes the governing Operating Agreements according to traditional principles governing the construction and interpretation of contracts.

23.     "Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution." *Golden Triangle #3, LLC v. RMP-Mallard Pointe, LLC,* 2020 NCBC LEXIS 37, at *10 (N.C. Super. Ct. Mar. 23, 2020) (quoting *Certainteed Gypsum NC, Inc. v. Duke Energy Progress, LLC,* 2018 NCBC LEXIS 91, at *8 (N.C. Super. Ct. Aug. 28, 2018)); *see also* N.C.G.S. § 57D-10-01(c) ("It is the policy of this Chapter to give the maximum effect to the principle of freedom of contract and the enforceability of operating agreements.").

24. Defendant's Motion requires the Court to construe identical provisions in three operating agreements. The Court must first determine whether the language at issue is clear and unambiguous. *Golden Triangle #3, LLC*, 2020 NCBC LEXIS 37, at *10 ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." (quoting *Walton v. City of Raleigh*, 342 N.C. 879, 881 (1996))). "When a contract is in writing and free from any ambiguity which would require resort to extrinsic evidence, or the consideration of disputed fact, the intention of the parties is a question of law." *Id.* at *10–11 (quoting *Strader v. Sunstates Corp*, 129 N.C. App. 562, 568 (1998)).

25. In contrast, "[a]n ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of reasonable interpretations." *Id.* at *11 (quoting *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC,* 365 N.C. 520, 525 (2012)). "If there is any uncertainty as to what the agreement is between the parties, a contract is ambiguous." *Id.* (quoting *Crider v. Jones Island Club, Inc.*, 147 N.C. App. 262, 267 (2001)) (cleaned up).

26. While the parties' varying interpretations may be some indication that the language of the contract is ambiguous, *see id.* (noting that the mere existence of a dispute as to the parties' interpretation "is some indication that the language of the contract is, at best, ambiguous" (quoting *WakeMed v. Surgical Care Affiliates, LLC,* 243 N.C. App. 820, 825 (2015))), "[w]hether or not the language of a contract is ambiguous . . . is a question for the court to determine[,]" *id.* (quoting *W & W Partners, Inc. v. Ferrell Land Co., LLC,* 2018 NCBC LEXIS 52, at *12 (N.C. Super. Ct. May 22,

2018)). However, "[i]f a court finds a contract ambiguous, the intent of the parties becomes a question of fact." *Id.* (quoting *Certainteed Gypsum NC,* 2018 NCBC LEXIS 91, at *9) (quotation marks omitted); *see also Leonard v. Pugh,* 86 N.C. App. 207, 210 (1987) ("Ambiguous contracts must be interpreted by a jury under proper instructions of the law.").

27.     The Court starts with an analysis of Section 10.1, the mandatory dissolution provision, before moving to whether the Estate has the voting rights of a member.

a.  Section 10.1, Events of Dissolution

28.     Article X, Events of Dissolution, Section 10.1(d), provides:

> 10.1 Mandatory Dissolution Events.  Upon the occurrence of any of the following events the Company will be dissolved unless within 90 days following the occurrence, the Members mutually agree in writing otherwise:
> . . .
> (d) death or an event of bankruptcy as set forth in the Act.

(Operating Agreements, § 10.1(d).)

29.     The Estate argues that use of the plural "Members" and the term "mutually agree" in Section 10.1 make it clear that a single member, acting alone, cannot decide to continue operations and avoid the mandatory dissolution event. The Estate contends that this is true even if the dissolution event—the death of one member—means only one member is left. Had that been the parties' intention, the Estate argues, the Operating Agreements would have specified that the surviving member could make the decision alone.

30.    Plaintiff responds that use of the plural "Members" and the phrase "mutually agree" does not clearly establish that two or more members must exist in order for the clause to have effect because only two members were ever contemplated under the LLCs here, and the dissolution provision of the Operating Agreements requires that one of them die before it is triggered.  If two exist and one dies, Plaintiff argues, there could never be more than one member, and the Estate's reading of the provision would render it meaningless.

31.    The plain language of Section 10.1 compels the Court to agree with the Estate.  The Operating Agreements make clear that dissolution upon the death of a member is considered a "mandatory" event that "will" happen absent agreement otherwise, and there are limitations on how, when, and who can make such an agreement otherwise:  it must be in writing; it must occur within 90 days of the death; and it must be made by "Members" who "mutually agree."

32.    "Where a contract does not define a term used, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended."  *WakeMed,* 243 N.C. App. at 825 (cleaned up).  Webster's Dictionary defines "agree" as "to concur in something," or "to accept or concede something (such as the views or wishes of another)."  Merriam-Webster, http://www.merriam-webster.com/dictionary/agree (last visited Feb. 8, 2022).  Webster's defines "mutual" as "directed by each toward the other or the others," "shared in common," or "joint."  Merriam-Webster, http://www.merriam-webster.com/dictionary/mutual (last visited Feb. 8, 2022).  Both words contemplate

the involvement of more than one person. Therefore, use of the plural "Members," when combined with the term "mutually agree," conveys the parties' intention for at least two members to exist and to except to mandatory dissolution in order to prevent it from occurring. Despite Plaintiff's urging, the Court cannot ignore the meaning of these words. *See Fiske v. Kieffer*, 2016 NCBC LEXIS 12, at *11–12 (N.C. Super. Ct. Feb. 16, 2016) ("[T]he various terms of the contract are to be harmoniously construed, and if possible, every word and every provision is to be given effect. It is presumed that each part of the contract means something." (quoting *WakeMed,* 243 N.C. App. at 824)).[3]

33. Moreover, nothing in the language of the Operating Agreements establishes that the parties intended for the number of members in the LLCs to be capped at two. In fact, the Operating Agreements begin with language recognizing that "such other persons . . . may be admitted in the future." (Operating Agreements, 1.) They also contain provisions for the transfer of "percentage interests" to third parties—new members—when approved by current members holding a majority of those interests. (Operating Agreements, § 9.1.) Indeed, Wendover Donuts, LLC had a third member for a short period of time. (Am. Compl. ¶ 11.) Thus, it would have been possible for one of those three members to die and for that LLC still to have two members who could "mutually agree" to continue operations.

---

[3] The parties' choice of words matters. Had the question involved only whether use of the plural "Members" could be read as the singular "Member," a canon of construction might have supported Plaintiff's position. But there is more involved here than simply whether the word "Members" is read as singular or plural. The Operating Agreements use the phrase "the Members mutually agree." As the Estate argued, reading the clause to mean that Plaintiff "agreed with himself" is nonsensical.

34.     Accordingly, the Court GRANTS this aspect of Defendant's Motion and declares that Section 10.1 requires the agreement of more than a single member to continue operations. Consequently, Plaintiff's attempted resolutions cannot forestall dissolution of the LLCs as mandated by Section 10.1 of the Operating Agreements.

b. <u>The Status of the Estate</u>

35.     The Estate also requests a declaration that the Operating Agreements specify that Dr. Agarwal's rights as a member passed to it. It then argues that because, as a member, it did not "mutually agree" to continue operations, the LLCs must be dissolved.

36.     To determine if the Estate is a member, the Court looks first to the North Carolina Limited Liability Company Act (the "Act"). The Act provides that "[a] person ceases to be a member [of an LLC] upon the occurrence of . . . the person's death." N.C.G.S. § 57D-3-02(a)(2). The Act further provides that, in the event of a member's death, "that person's estate . . . will automatically become an economic interest owner entitled only to the economic interest attributable to the person's ownership interest[.]" N.C.G.S. § 57D-3-02(b). Accordingly, the default rule is that the Estate is not a member of the LLCs.

37.     Nevertheless, the Act allows the parties to vary these default terms by expressly stating in the Operating Agreements their intention for the Estate to be a member. *See* N.C.G.S. § 57D-2-30(a) ("[T]he provisions of this Chapter . . . will apply only to the extent contrary or inconsistent provisions are not made in, or are not otherwise supplanted, varied, disclaimed, or nullified by, the operating agreement.");

*Battles,* 2014 NCBC LEXIS 54, at *8 ("The LLC Act contains numerous 'default' provisions or rules that will govern an LLC only in the absence of an explicitly different arrangement in the LLC's articles of organization or written operating agreement." (quoting *Crouse v. Mineo*, 189 N.C. App. 232, 237 (2007))).

38. The parties disagree regarding whether the language of the Operating Agreements explicitly establishes that the Estate became a member of the LLCs upon Dr. Agarwal's death. Importantly, the Court observes that there is no provision in the Operating Agreements that speaks directly to the point. Undeterred, however, the Estate looks to the implications of various other provisions in the Operating Agreements to conclude that, put in context, they could only mean that the Estate is a member of the LLCs.

39. The Estate first points to the language of Section 3.7:

3.7 Voting by Certain Members. Management Certificates standing in the name of a corporation, partnership or company may be voted by such officer, partner, agent or proxy as the Bylaws of such entity may prescribe or, in the absence of such provision, as the Manager or officers of such entity may determine. Interests held by a trustee, personal representative, administrator, executor, guardian or conservator may be voted by him, either in person or by proxy, without a transfer of such certificates into his name.

(Operating Agreements, § 3.7.) Put simply, the Estate argues, this provision means that the Estate retains the voting rights of Dr. Agarwal, even without a transfer of "Management Certificates" in the personal representative's name.

40. The Estate then argues that Sections 9.1 and 2.1(p) of the Operating Agreements, read together, support their position that the Estate became a member on Dr. Agarwal's death. Section 9.1 states that upon death of a member, "his or her

Percentage Interests shall pass to his or her estate or other personal representative." (Operating Agreements, § 9.1.) Section 2.1(p) defines "Percentage Interest" as "that percentage of the Company owned by a Member." According to the Estate, use of the word "Member" in this context is conclusive proof that the parties intended for the Estate to have the rights of a member and not the limited rights of an economic interest holder.

41. The Estate further argues that Section 4.3(c) of the Operating Agreements, which speaks to transfers of interests, "contemplates that transfers could only occur from one member to a new member[,]" not to an economic interest holder. (Br. Supp. Mot. J. Pleadings 3, ECF No. 36.) Section 4.3(c) states: "Upon the transfer of an interest in the Company, the Capital Account of the transferor Member . . . that is attributable to the transferred Percentage Interest will be carried over to the transferee Member." (Operating Agreements, § 4.3(c).)

42. Plaintiff responds that Section 3.7 does nothing to clarify the issue. Instead, it governs voting by members that hold "Management Certificates," but no such certificates were ever issued by any of the LLCs. Plaintiff concludes that use of the term "executor" in that section just serves to confuse, rather than to clarify, the issue.

43. As for Sections 9.1 and 2.1(p), Plaintiff contends that they say nothing about the rights the Estate has as a member or an economic interest holder. Instead, these provisions speak only to the transfer of the percentage interest in the LLCs that was owned by Dr. Agarwal to the Estate. The language in these provisions, Plaintiff

argues, does not convey an explicit intent to vary from the statutory default rule that the Estate is an economic interest holder.

44.    Finally, Plaintiff responds that the language of Section 4.3(c) does not speak to the status of the Estate as a member versus an economic interest holder. Instead, Plaintiff argues, the provision speaks only to the handling of capital accounts, not voting rights.

45.    After a thorough review of the Operating Agreements, the Court agrees with Plaintiff. The language upon which the Estate relies is insufficient, standing alone, for the Court to declare as a matter of law that the Estate has the rights of a member. A jury could make the determination that the Estate seeks, but it could also find that the absence of a specific provision in the Operating Agreements signals the absence of an intent to make the Estate a member and that the statutory default provision controls.

46.    Section 3.7 does not assist Defendant in its argument. The reference to "Management Certificates" in an LLC owned by two individuals is itself confusing. Even if the last sentence of the section referencing "[i]nterests held by a[n] . . . executor" were to be read on its own, use of the term "such certificates" creates an ambiguity that is not capable of resolution at this early stage of the proceedings.

47.    As for the Estate's argument that Sections 9.1 and 2.1(p), read together, make it clear that the Estate has voting rights, the Court remains unconvinced. Section 9.1 merely requires the written consent of a majority of the "Percentage Interests" before a member may transfer or otherwise allow another Person (defined

as an individual or entity) to have an interest in any of the LLCs. An exception exists upon the death of an Individual Member, in which case his or her Percentage Interest passes to his or her estate. The Estate's argument appears to come from Section 2.1(p), which defines "Percentage Interest" as "that percentage of the Company owned by a Member[,]" and then goes on to say, "[t]he term includes the interest of the Manager and *the interests of the Members* where no distinction is required by the context in which the term is used herein." (Operating Agreement, § 2.1(p) (emphasis added).) Again, whether a jury would agree with the Estate regarding the import of the italicized phrase remains to be seen. However, the Court does not find the language sufficiently clear to declare as a matter of law that the Estate's interpretation is the one that was intended.

48. Because the language of the Operating Agreements is ambiguous with respect to whether the parties intended for the Estate to be a member of the LLCs, the Court DENIES the Estate's Motion for such a declaration.

## IV. CONCLUSION

49. WHEREFORE, for the reasons set forth above, Defendant Estate of Anil Agarwal's Motion for Judgment on the Pleadings is GRANTED in part and DENIED in part as follows:

(a) The Court DECLARES that Section 10.1 requires the agreement of more than a single member to avoid a mandatory dissolution event upon the death of a member;

(b) Consequently, IT IS ORDERED that Wendover Donuts, LLC; Kush Donuts, LLC; and Sarash Properties, LLC are each hereby dissolved and shall be wound up in accordance with Article XI of their respective operating agreements;

(c) The Court will set a date to hear from the parties with respect to the appointment of a Receiver and the disposition of any assets; and

(d) Except as herein stated, Defendant's Motion is DENIED.

SO ORDERED, this the 9th day of February, 2022.

/s/ Julianna Theall Earp

Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases